[Crim. No. 22572. May 16, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DARNELL LUCKY, Defendant and Appellant.

**COUNSEL**

Karl Phaler and Frank O. Bell, Jr., State Public Defender, under appointments by the Supreme Court, Monica Knox, Chief Assistant State Public Defender, and Jill Ishida, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz, John R. Gorey, Gary R. Hahn, Susanne C. Wylie, Andrew D. Amerson, William R. Weisman and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

EAGLESON, J.—This case arose under the 1978 death penalty initiative, now codified as Penal Code sections 190-190.5. (All statutory references are to the Penal Code unless otherwise indicated.) Defendant was convicted under this statute of two counts of first degree murder and attempted

robbery with two special circumstances attaching to each count—murder during the commission of attempted robbery and multiple murder. In addition, defendant was also convicted of six other robbery charges, stemming from three additional incidents which were separate from but related to the principal episode and which were consolidated with the murder charges for purposes of trial.

Following defendant's convictions at the guilt phase, the jury fixed the penalty at death. The appeal to this court is automatic. The appellate record discloses no prejudicial error in the proceedings below. We will therefore affirm the judgment in its entirety.[1]

I. SUMMARY OF FACTS AND PROCEEDINGS.

(A) *The Radio Shack Incident.*

On January 5, 1981, Robert Randolph and Dwight Ingram were working at a Radio Shack store in Los Angeles. Defendant and a male companion entered the store, and defendant walked directly to the rear. His companion pointed a gun at Ingram and informed him that this was a robbery. After being warned not to move or have his head blown off, Ingram removed money from a drawer and placed it along with his personal cash into a Radio Shack bag. Meanwhile, defendant entered the rear office with a four-inch knife in his hand and ordered Randolph to get under his desk. After binding the hands of the two employees, the robbers left, taking the day's receipts and several stereo items.

Later that evening, two Los Angeles police officers on a routine patrol on Ventura Boulevard observed defendant and his companion, Brown, walking along the street and noticed that Brown appeared to be carrying a gun.

The officers turned into a parking lot and saw Brown, whom they detained and patted down, without finding a gun. They subsequently observed an interior light on in an orange Vega parked in the lot about 50 feet away. They went over to the car and saw defendant lying on the front seat. In the vehicle, the officers observed various items taken in the Radio Shack

---

[1] An earlier opinion in this case, affirming the guilt and special circumstance findings but reversing the penalty judgment, was filed on December 31, 1985. This court granted rehearing on February 19, 1986. The following discussion of guilt and penalty phase evidence, and of the guilt and special circumstance issues, is largely derived from the prior majority opinion.

A related petition for habeas corpus was filed on August 14, 1987. (S002037.) In view of its tardiness, and because it was submitted just before long-scheduled argument in a long-pending matter, we have determined to proceed with the appeal and consider the habeas petition separately.

robbery. The following day, the two Radio Shack employees identified defendant in separate photographic lineups.

(B) *The West Side Robberies and Murders.*

On the afternoon of January 20, 1981, Jack Krim and Christian Brugman were working at M and B Jewelers on West Third Street in Los Angeles. Defendant rang the outside bell and Krim buzzed him into the store through two security doors.

Defendant asked Krim, who was at the front jewelry counter, whether he bought gold. At the same time, he removed a gold chain from around his neck and placed it on the counter. As he turned to weigh the chain on his scale, Krim felt something at his back and heard defendant say, "Where's the cash?" Turning around, Krim saw defendant pointing a gun at him.

Krim told defendant that he did not have any cash and begged him not to shoot. Defendant pulled the top of his small automatic backwards, and the gun clicked. Krim then grabbed his hand and forced it so the gun pointed away. The two wrestled, while defendant repeatedly screamed, "Where is the cash?"

Defendant then forced a struggling Krim into the back office, where he opened the safe. He removed some envelopes containing precious stones and ran out of the shop through the back door. Videotape cameras recorded most of the activity which had occurred and the tapes were later introduced as evidence; in addition, both Krim and Brugman later identified defendant through a photo lineup.

Earlier that afternoon, defendant had met John Darryl Jones and Austin Willis. He told them he wanted to "make some money," and offered them $10 worth of gas if they would drive him. The three then drove together to the area of Third and Fairfax in a Cadillac belonging to Jones's brother. After they parked, defendant got out and took the gold chain with him.

After about 10 minutes, Jones and Willis saw defendant running towards them. In his hands he was carrying the gold chain, some white envelopes and the gun. Defendant seemed very agitated. He told them he had robbed a jewelry store and that he had not wanted to leave anyone alive but that the gun had malfunctioned. The three then left the area in the car, as defendant worked on his gun, finally throwing it on the floor.

The trio next stopped at a Rolls Royce repair facility. Defendant asked the others to help him rob the place, but the attempt failed when both Jones

and Willis lost their nerve and left. Jones then drove to the vicinity of Wilshire and Saltair and parked.

Defendant exited the car, with the gold chain in his hand and the gun in his back pocket, and walked around the corner on Wilshire without stating his intentions. Jones and Willis also got out of the car, and Jones began urinating on the side of a building. Shortly thereafter, they both heard gunshots, and Jones could see the sweater worn by defendant through the back door of the O and T Jewelry Store. Jones and Willis soon heard glass breaking and saw defendant leave the store through a broken window.

Two passersby also witnessed the scene at the O and T Jewelry store and both testified at trial. Their testimony confirmed Jones's and Willis's description of the events, and at least one tentatively identified defendant as the man seen running from the store.

According to the testimony of Jones and Willis, defendant emerged from the store window and ran back to the car with the gun in his hand, but without the gold chain. Jones drove away quickly, and shortly thereafter defendant threw the gun out through the sun roof of the car. He then told them that he had shot two people, not wanting to leave anyone to identify him.

Diran Odel, co-owner of O and T Jewelry store, died of a gunshot wound to the head. He had another wound in his arm. Kegam Toran, Odel's partner, also died of a gunshot wound to the head.

Later in the evening of January 20, the murder weapon was found on the sidewalk at Texas and Saltair. The bullets recovered from the two victims were identified as having been fired from this gun. Defendant's gold chain was found on the premises of O and T Jewelry (the store did not carry this type of chain). In addition, a latent print on the countertop at O and T Jewelry was subsequently identified as defendant's.

Austin Willis was arrested early the next morning, January 21, following surveillance of the Cadillac. John Darryl Jones was arrested a short time later. Examination of the clothing which the two had worn did not reveal any fragments of glass. Willis and Jones were kept apart and interviewed separately. Both identified defendant as the murderer.

Nearly three months later, defendant was apprehended following the armed robbery of a Beverly Hills motoring accessories store. Items stolen in this robbery and a small handgun were recovered. At the preliminary hearing on these Beverly Hills charges, several employees of the auto parts

store positively identified defendant as one of the robbers who had wielded a gun.

(C) *Procedural History.*

Informations in the three consolidated cases (amended to include two allegations of prior convictions) were filed on October 8, 1981. The 10-count informations charged the Radio Shack robbery as count 1; the robbery at M and B Jewelers as count 2; the attempted robberies and murders at O and T Jewelry as counts 3 through 6; and the Beverly Hills robbery of 4 persons at the auto parts store as counts 7 through 10. In addition, defendant was charged with three allegations of firearm use and one allegation of knife use in connection with the various robbery charges.

On January 6, 1982, defendant (represented by Attorney Brian Braff) waived his rights to a jury trial and submitted counts 7 through 10 of the consolidated information (the Beverly Hills incident) on the transcript of the preliminary hearing. Five days later, the court found him guilty of four counts of robbery in the Beverly Hills incident, finding a firearm use allegation true as to one count. Sentencing on these charges was delayed pending completion of his trial on the other charges. Subsequently, Attorney Curtis Shaw became the sole representative for defendant.

After a disagreement between the defendant and Shaw over trial tactics, defendant's mother considered retaining private counsel. Attorney Shaw had wanted to use a psychological defense which would have included evidence of defendant's history of drug abuse, but defendant refused to permit this. After they reached an agreement not to go forward with such a defense, defendant decided to retain Shaw as his attorney and the case was set for trial.

(D) *Guilt Trial.*

The evidentiary portion of defendant's guilt trial lasted five days. The prosecution presented considerable evidence concerning the Radio Shack robbery, the robbery at M and B Jewelers, and the attempted robberies and murders at O and T Jewelry. As noted above, eyewitnesses positively identified defendant regarding his participation in all three incidents.

The defense presented only one witness, defendant himself.[2] Defendant admitted the facts of the robberies at the M and B Jewelers as they had been

---

[2] Prior to defendant's testimony, defense counsel Shaw stated on the record (though outside the presence of the jury) that he had continually advised the defendant *not* to take the

presented by the people. He also identified the chain left at O and T Jewelry as the one he had also used in the M and B robbery. However, defendant offered a different version of the murders which occurred at O and T Jewelry. He testified that he and Jones had entered O and T Jewelry to "case" the location and emerged to discuss the planned robbery. Willis then went into the store with the gun and gold chain. Defendant testified that he was outside the store when he heard the shots fired and that Willis later told him he had "dropped" the two victims. Defendant did not testify with respect to the Radio Shack matter.

Following the evidentiary portion of the guilt trial but before closing argument by both sides, defendant began to act in a bizarre manner. He appeared in court in a jail hospital ward gown, and defense counsel requested a recess so that his client could be examined by physicians as to his competency to stand trial. This was agreed to, and defendant was subsequently examined by two court-appointed psychiatrists, pursuant to sections 1368 and 1369. All of these proceedings took place outside the presence of the jury. After examining defendant, both psychiatrists testified that in their opinion defendant was faking. They further stated that defendant was competent to assist in his own defense should he decide to cooperate.

Since defendant continued to exhibit bizarre behavior,[3] the court decided that his continued presence would be disruptive and possibly prejudicial to his own case, and ordered him placed in a lockup where he would be able to hear the remaining portion of the trial. (Defense counsel agreed to this arrangement after consulting with defendant.) The court then instructed the jury on the guilt phase issues.

The jury subsequently found defendant guilty on all counts. In addition, the jury found true the special circumstance of multiple murder and murder in the course of attempted robbery, with respect to each of the two murders. Further, the jury returned special written verdicts finding that each first degree murder was intentional, deliberate, premeditated, and done with express malice aforethought.

(E) *Penalty Phase Trial.*

At the penalty trial the following week, the prosecution called a number of witnesses to testify about a variety of incidents in defendant's past. These

stand in his own defense. However, recognizing defendant's basic constitutional right to testify, as affirmed by this court in *People* v. *Robles* (1970) 2 Cal.3d 205 [85 Cal.Rptr. 166, 466 P.2d 710], counsel reluctantly permitted him to testify in his own behalf. This disagreement is raised by appellate counsel as evidence of why the court should have further explored the potential conflict between defendant and his trial counsel (see *post,* at p. 282).

[3] For example, defendant began removing his clothes in the courtroom, lay sprawled out on the counsel table, and generally behaved in a very odd and uncooperative manner.

included several instances of alleged criminal activity while defendant was in prison as well as an incident in which defendant wounded his mother and a friend with a shotgun. In addition to this testimony, the prosecution introduced documentary evidence regarding defendant's prior felony convictions for rape and armed robbery.[4] The prosecution also called Kenneth Ryder, defendant's parole agent from mid-1979 to mid-1980, to the stand. Rather than questioning Ryder about any specific acts of misconduct, the prosecution asked whether defendant was easy to supervise on parole. Mr. Ryder stated that defendant was "manipulative, avoided supervision, making merely enough contact to avoid what we call a suspension for absconding." Parole Agent Ryder repeated several of these characteristics in later testimony. He also stated that he believed defendant was addicted to narcotics because his cumulative summary had a history of controlled substance abuse for which he was being treated during the parole period.

Defendant was present in the courtroom throughout the entire penalty phase. His counsel chose not to put on any witnesses of his own, but extensively cross-examined several of the prosecution's witnesses.

On cross-examination, defendant's mother testified that she had experienced difficulty with her son because of drugs, particularly PCP. When defendant would experiment with PCP, he would go out of control and act wildly, thinking everyone was his enemy. His mother explained that the police would not help her and that she had asked his parole officer many times for assistance.

Defense counsel also introduced defendant's medical records from Metropolitan State Hospital into evidence. In his closing argument, counsel attempted to portray defendant as a "victim of society"—someone with serious drug and mental problems who had never received the help he needed. He reiterated Mrs. Hudson's testimony about her son's hallucinations and emphasized her futile attempts to obtain some sort of treatment for him. After deliberating for several hours, the jury returned a verdict of death.

## II. Guilt Phase Issues.

### (A) *Consolidation.*

 Defendant contends that the trial court erred in applying section 954 to consolidate all of the charges set forth in the information. Section

---

[4] The court properly instructed the jury that prior criminal activity could not be considered as an aggravating factor unless such acts were proven beyond a reasonable doubt. (See *People v. Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279].) The court also instructed on the elements of the various crimes relevant to the penalty phase evidence.

954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts. . . . [P]rovided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

Defendant argues that the trial court improperly consolidated the information stemming from the separate robbery incidents because the charged offenses were neither "of the same class" nor "connected together in their commission." He further contends that the consolidation order constituted prejudicial error because it imposed additional burdens upon his two defense attorneys and ultimately impaired his right to adequate legal representation in a complex capital case.

Contrary to defendant's assertion, the statutory requirements for joinder under section 954 were satisfied here. It is obvious that the robbery and attempted robbery charges set forth in the information belong to the same class of crimes. (*People* v. *Conrad* (1973) 31 Cal.App.3d 308, 315 [107 Cal.Rptr. 421].) As for the robbery and murder charges, they are also deemed to be of the "same class," insofar as both offenses share common characteristics as assaultive crimes against the person. (*People* v. *Rhoden* (1972) 6 Cal.3d 519, 524-525 [99 Cal.Rptr. 751, 492 P.2d 1143]; *Coleman* v. *Superior Court* (1981) 116 Cal. App.3d 129, 135 [172 Cal.Rptr. 86].)

 Furthermore, offenses which are committed at different times and places against different victims are nevertheless "connected together in their commission" when they are, as here, linked by a "'common element of substantial importance.'" (*People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752]; *People* v. *Polk* (1964) 61 Cal.2d 217, 230 [37 Cal.Rptr. 753, 390 P.2d 641]; *People* v. *Chessman* (1959) 52 Cal.2d 467, 492 [341 P.2d 679].) "[T]he element of intent to feloniously obtain property runs like a single thread through the various offenses. . . ." (*Chessman, supra,* at p. 492; *Conrad, supra,* 31 Cal.App.3d at p. 315.) In addition, the facts underlying the joined offenses share certain characteristics—the armed robber, usually joined by an accomplice, victimized small businesses which were managed by few employees, sold specialized merchandise, and were located in the same geographical area. In both jewelry store incidents, the robber had carried a gold chain into the store, apparently on the pretext of attempting to sell it.

"The determination that the offenses are 'joinable' under section 954 is only the first stage of analysis because section 954 explicitly gives the trial

court discretion to sever offenses or counts 'in the interest of justice and for good cause shown.' " (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699]; *Coleman, supra,* 116 Cal.App. 3d at p. 135.) Since the statutory requirements for joinder were met in the present case, appellant can establish error only on a clear showing of prejudice. (*Williams* v. *Superior Court, supra,* at p. 447; *People* v. *Kemp* (1961) 55 Cal.2d 458, 477 [11 Cal.Rptr. 361, 359 P.2d 913]; *People* v. *Poon* (1981) 125 Cal.App.3d 55, 69 [178 Cal.Rptr. 375].)

Defendant claims that consolidation was prejudicial because it impaired his right to effective assistance of counsel by placing additional burdens on each of his defense attorneys, particularly on the attorney who handled the capital charges. This argument mirrors defendant's second contention, *post* at page 278, regarding the issue of dual representation in capital cases. Since he asserts that the additional burdens of consolidation should have been shared by two defense counsel, it is actually the subsequent denial of dual representation, not the consolidation order itself, which gives rise to his somewhat confused inadequate-assistance argument. Defendant's attempt to frame the question of inadequate assistance of counsel within the context of the consolidation order merely serves to obfuscate the real issue.

■ The essence of defendant's claim is that prejudice is inevitable whenever a capital case is consolidated with unrelated or independent offenses. Defendant argues that admitting evidence of unrelated charges requires the court to rely on jury instructions to prevent the jury from merely combining the bulk of the evidence and convicting the defendant on the basis of the numerous charged offenses. Therefore, defendant asks us to conclude that such joinders should never be permissible.

Courts must always examine consolidation motions for their potentially prejudicial effect, particularly in capital cases. (See, e.g., *People* v. *Smallwood* (1986) 42 Cal.3d 415, 430-431 [228 Cal.Rptr. 913, 722 P.2d 197]; *Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 454.) However, there is no basis for adopting the broad per se rule defendant suggests. (See *People* v. *Balderas* (1985) 41 Cal.3d 144, 176 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Caldwell* (1980) 102 Cal.App.3d 461, 483 [162 Cal.Rptr. 397]; *Conrad, supra,* 31 Cal.App.3d at p. 315.)

Prejudice may arise from consolidation where it allows the jury to hear inflammatory evidence of unrelated offenses which would not have been cross-admissible in separate trials. Even in capital cases, however, consolidation may be upheld on appeal where the evidence on each of the joined charges is so strong that consolidation is unlikely to have affected the verdict. (*Smallwood, supra,* 42 Cal.3d at pp. 429-430.)

The instant charges might have been cross-admissible in separate trials to show common identity on a modus operandi theory.[5] Even if not, however, no prejudice appears on appeal, since the evidence on all the consolidated charges was extremely strong. Eyewitnesses positively identified defendant in connection with the Radio Shack and M & B Jewelers robberies. In the Radio Shack case, defendant was apprehended hiding in a car containing items stolen from the store. Videotapes of the M & B Jewelers robbery showed defendant as the perpetrator.

Evidence in the capital case, the O & T Jewelry robbery-murder, was somewhat more circumstantial, but still extremely persuasive. Accomplices Austin and Willis, kept apart and interviewed separately, both identified defendant as the one who entered the store, shot the owners, and emerged through a broken window. Defendant's gold chain and his fingerprint were found in the store. Two passersby tentatively identified him as the robber. No fragments of glass were found on clothing Austin and Willis had worn the day of the robbery.

Testifying in his own behalf, defendant identified Willis as the O & T Jewelry killer. Defendant admitted the gold chain left in the store was his, asserting simply that Willis was carrying the chain when Willis entered the premises. We see no reasonable probability that defendant would have obtained a more favorable verdict on any of the joined charges had they been tried separately. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)

In sum, we find that the joinder of the various informations in the instant case satisfied all statutory requirements, did not unfairly burden defendant's counsel, and did not serve to prejudice defendant under standards enunciated in our recent decisions. The consolidated trial does not warrant reversal of any conviction.

(B) *Dual Representation.*

■ Defendant also contends that the trial court's refusal to permit continued dual representation constituted reversible error. ■ In *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108], we held that under certain circumstances, a trial court's denial of an

---

[5] As we note above, "the joined offenses share certain characteristics—the armed robber, usually joined by an accomplice, victimized small businesses which were managed by few employees, sold specialized merchandise, and were located in the same geographical area. In both jewelry store incidents, the robber had carried a gold chain into the store, apparently on the pretext of attempting to sell it." (*Ante,* at p. 276.) The two jewelry store robberies occurred within hours of each other.

indigent defendant's motion for the appointment of a second attorney in a capital case (§ 987.9) is an abuse of discretion. Recognizing the importance of a capital defendant's right to a complete and full defense, we concluded that "under a showing of genuine need . . . a presumption arises that a second attorney is required." (*Keenan, supra,* at p. 434.)

Trial courts must "apply a higher standard than bare adequacy to a defendant's request for additional counsel." (*Id.,* at p. 434.) The initial burden, however, is on the defendant to present a specific factual showing as to why the appointment of a second attorney is necessary to his defense against the capital charges. The record clearly reveals that defendant in this case failed to meet this initial burden.

■ Defendant contends that consolidation deprived him of adequate legal assistance because it forced Attorney Shaw to defend him against the Beverly Hills robbery charges as well as the capital charges. Prior to consolidation, the Beverly Hills robbery charges had been handled by Attorney Braff, but after those charges had been submitted on the transcript of the preliminary hearing, it was decided to discontinue dual representation.[6]

Attorney Shaw did not, however, assert defendant's right to a second attorney under section 987.9 and made no attempt to present the trial court with specific facts and argument to establish a presumption of genuine need for dual counsel.[7] Furthermore, our review of the record reveals no evidence to show that counsel was hampered either by the consolidation of the informations or the discontinuation of dual representation to such an extent that he could not provide his client with adequate representation. Neither does defendant assert ineffective assistance of counsel.

We have previously held that capital defendants do not have the absolute right to the appointment of an additional attorney. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 286 [168 Cal.Rptr. 603, 618 P.2d 149].) The trial

---

[6] The Beverly Hills robbery charges had virtually no impact on the capital charges because no evidence of those charges was ever presented to the jury during the guilt phase of defendant's consolidated trial. In fact, Braff was the attorney who represented defendant when the Beverly Hills charges were submitted on the transcript of the preliminary hearing. The only mention of the Beverly Hills convictions came during the prosecution's presentation of the penalty phase evidence. Moreover, since Braff was originally appointed to represent defendant on the Beverly Hills robbery charges, there was never any showing that Braff's assistance would be critical to his defense in the consolidated trial. Thus, defendant's assertion that he was prejudiced by the discontinuation of dual representation is belied by the record.

[7] In *Keenan,* on the other hand, counsel established genuine need by showing that he had to interview approximately 120 witnesses, prepare for extensive scientific and psychiatric testimony, develop issues and evidence to support mitigation of the possible death sentence, and anticipate the prosecution's introduction of evidence from five other unrelated criminal cases pending against the defendant. (*Keenan, supra,* 31 Cal.3d at p. 432.)

court, in its discretion, may permit dual counsel where the circumstances in a particular case seem to warrant it. (*Id.*, at p. 287.) Here, however, defendant's abstract assertion that consolidation in capital cases inherently imposes an undue burden on defense counsel cannot be used as a substitute for a showing of genuine need.

(C) *Conflict With Appointed Counsel.*

■■■ Defendant strenuously argues that the trial court committed reversible error when it continued trial proceedings without giving him the opportunity to state the specific reasons for his "conflict" with appointed counsel. Specifically, he contends that when appointed counsel, Curtis Shaw, informed the court that defendant was considering the idea of retaining private counsel in lieu of Mr. Shaw, the court had a duty under *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] to give defendant an opportunity to state fully the grounds for his dissatisfaction with appointed counsel.

At the outset of the proceedings, prior to the voir dire of the jury, the court was considering the issue of the continuance of the trial date. At this point, Mr. Shaw informed the court that defendant was seeking to hire a private attorney and that his mother was attempting to raise the necessary attorney fees. Counsel also indicated that there was a "difference of opinion" between himself and the defendant with respect to the trial tactics which would be employed in the defense. During the ensuing discussion, the court advised defendant that a private attorney might cost $25,000-$30,000 and that new counsel might choose a similar approach to that recommended by Mr. Shaw. In response to a question from the court, defendant indicated that he had spoken to a private attorney, a Mr. Tarlow, and the court then granted a continuance so that defendant could further explore the possibility of retaining new counsel.

Two days later, Mr. Shaw informed the court that defendant would not be hiring new counsel and that he had discussed the "ramifications" of this with his client. Counsel further explained that the disagreement stemmed from defendant's refusal to permit any type of psychological defense, which would have raised defendant's history of drug abuse. The court then asked defendant: "Mr. Lucky, have you got any problems with Mr. Shaw handling this, other than you think the case should be handled one way or the other?" Defendant replied, "That's about all, Your Honor." The court then asked defendant whether he had any complaints about starting the trial in five days, and he replied that he did not. The court subsequently set the case for trial on the agreed upon date, and defendant never raised any

indications throughout the remainder of the proceedings that he had any form of disagreement with his appointed counsel.

In *Marsden, supra,* we held that where a judge denies a motion for the substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, the judge abuses his or her discretion to determine the competency of the attorney. (2 Cal.3d at p. 124.) We have further held that a defendant must be permitted to state the reasons why he believes that a court-appointed attorney should be discharged. (*Ibid.*; *People* v. *Lewis* (1978) 20 Cal.3d 496, 497 [143 Cal.Rptr. 138, 573 P.2d 40].)

The People contend that both *Marsden* and *Lewis* are easily distinguishable from the facts of the instant case. They argue that the trial court here was not required to make any further inquiry into defendant's reasons for attempting to hire a private attorney because defendant never moved, or even asked for, substitution or discharge of his court-appointed attorney. They further add that when the court directly asked the defendant whether he had any conflict with Mr. Shaw, other than a disagreement over trial tactics, defendant indicated that he had none. In addition, they contend that the defendant was given several opportunities to address the court about this matter and never once requested another attorney. The record fully supports these contentions.

Our review of the *Marsden* and *Lewis* cases as well as this court's decision in *People* v. *Hidalgo* (1978) 22 Cal.3d 826, 827 [150 Cal.Rptr. 788, 587 P.2d 230] clearly reveals that a trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises when the defendant in some manner moves to discharge his current counsel.[8] The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing.

There is no constitutional right to an attorney who would conduct the defense of the case in accord with the whims of an indigent defendant. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 704 [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *Rhines* (1982) 131 Cal. App.3d 498, 505 [182 Cal.Rptr. 478]; *People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 761 [170 Cal.Rptr. 62]; *People* v. *Lindsey* (1978) 84 Cal.App.3d 851, 860 [149 Cal.Rptr. 47, 2 A.L.R.4th 485].) Nor does a disagreement between defendant and appointed counsel concerning trial tactics necessarily compel the appointment of another

---

[8] We do not necessarily require a proper and formal legal motion, but at least some clear indication by defendant that he wants a substitute attorney. The record in this case reveals no such indication by defendant.

attorney. (*People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008], cert. den. 401 U.S. 919 [27 L.Ed.2d 821, 91 S.Ct. 903]; *Rhines, supra,* 131 Cal.App.3d at p. 505.)

■ Defendant asserts that three specific instances which occurred after trial commenced reflect a breakdown in the attorney-client relationship, thereby jeopardizing his right to effective assistance of counsel. The first instance occurred when Mr. Shaw informed the court that his client had decided to take the stand in his own behalf, against the advice of counsel. The People correctly respond that defendant's decision to testify in his own behalf does not constitute proof that there had been a breakdown in his relationship with his counsel, nor does it prove that defendant was denied his right to effective assistance of counsel. We have held that the right to testify in one's own behalf is of such fundamental importance that a defendant who demands to take the stand, contrary to the advice of counsel, has the right to do so. (*Robles, supra,* 2 Cal.3d at p. 215 [85 Cal.Rptr. 166, 466 P.2d 710].) However, we have never held that such a situation requires that defendant be permitted new counsel, or that such a disagreement reflects a fundamental breakdown in the attorney-client relationship.

Defendant's second example involves the portion of the guilt phase proceedings, prior to closing argument and jury instructions, where defendant began to act in a very bizarre manner and was eventually removed from the courtroom. At the time, the court asked two psychiatrists to examine defendant and evaluate his competency to stand trial. Both concluded that he was voluntarily feigning mental illness. The court noted that when defendant would determine that things were not "going his way," he would choose to become uncooperative, but that when defendant decided it was in his interests to cooperate, he would cease his bizarre behavior. The People correctly contend that this was not an example of a fundamental breakdown in the attorney-client relationship but rather merely evidence of defendant's decision to be uncooperative. (*Floyd, supra,* 1 Cal.3d at p. 705.)

The third example cited by defendant seems to further substantiate the People's contention that defendant *voluntarily* elected not to cooperate with his counsel at various times in the trial. Defendant refers us to a statement on the record by defense counsel in which he explains that his client refused to cooperate in any type of psychological defense which might have involved evidence of prior drug abuse.[9] Mr. Shaw's statement clearly reflects a

---

[9] This statement actually occurred during the penalty phase of the proceedings, following the testimony of defendant's mother about his problems with drug abuse. Mr. Shaw offered it on the record, but outside the presence of the jury. The record clearly indicates that Mr. Shaw was attempting to explain to the court why he had not offered any evidence of defendant's mental state, when conceivably such evidence might have been relevant to the capital

disagreement between himself and defendant over tactics as well as the latter's uncooperative and perhaps unwise attitude toward his own defense. It does not, however, reflect any desire on defendant's part for a discharge of his attorney nor any duty on the trial court to conduct a *Marsden* hearing.

In sum, since defendant never moved for the discharge or substitution of his court-appointed attorney, and declined several opportunities afforded him by the court to state any grounds for dissatisfaction with Mr. Shaw, the trial court was under no duty to make any further inquiries. As such, no error under *Marsden* or *Lewis* resulted, and defendant is not entitled to a reversal of his conviction on these grounds.

(D) *Submission of Beverly Hills Robbery Counts on Transcript of Preliminary Hearing.*

Defendant contends that he is entitled to a reversal of his conviction on counts 7 through 10 on the grounds that the trial court's advice regarding his constitutional rights was incomplete and that proper waivers were not obtained before these counts were submitted on the transcript of the preliminary hearing. Counts 7-10 involved four separate charges of robbery (with one allegation of firearm use) stemming from the robbery of four persons at a Beverly Hills motor parts store, in which defendant participated almost three months after the jewelry store robberies and murders. Defendant was represented on these charges by Attorney Brian Braff; the decision to stipulate to the submission of these counts on the transcript of the preliminary hearing was made prior to commencement of trial on the capital charges but after the consolidation of the various informations.[10]

In *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592 [119 Cal.Rptr. 302, 531 P.2d 1086], we set forth a series of requirements governing the

---

charges against his client. In addition to noting the defendant's refusal to cooperate in this type of defense, Shaw also explained that the confidential report of a psychiatrist, who had examined defendant six months earlier, did not contain findings favorable to a defense based on mental state.

[10] Defendant argues that the decision to submit these counts on the transcript of the preliminary hearing was made "under pressure from the Court as trial neared to proceed with a single counsel." This is an erroneous description of these events. The record indicates that Attorney Braff and the prosecutor had been discussing the possibility of this submission for quite some time and may even have reached a tentative agreement to this effect prior to the point at which the various informations in the case were consolidated. In any event, there is absolutely nothing in the record to suggest that either defendant or the attorney who represented him on these charges made the decision to submit these four counts "under pressure." After Attorney Braff and the prosecutor had reached the agreement to submit these counts on the transcript of the preliminary hearing, the judge found defendant guilty of four counts of robbery, with one allegation of firearm use also found to be true. Sentencing on these counts was then postponed until completion of defendant's trial on the capital charges, and Attorney Shaw agreed to represent defendant for purposes of sentencing.

submission of cases on the transcript of their preliminary hearing: "[I]n all cases in which the defendant seeks to submit his case for decision on the transcript or to plead guilty, the record shall reflect that he has been advised of his right to a jury trial, to confront and to cross-examine witnesses, and against self-incrimination. It shall also demonstrate that he understands the nature of the charges. Express waivers of the enumerated constitutional rights shall appear. In cases in which there is to be a submission without a reservation by the defendant of the right to present evidence in his own defense he shall be advised of that right and an express waiver thereof taken. If a defendant does not reserve the right to present additional evidence and does not advise the court that he will contest his guilt in argument to the court, the defendant shall be advised of the probability that the submission will result in a conviction of the offense or offenses charged. In all guilty plea and submission cases the defendant shall be advised of the direct consequences of conviction such as the permissible range of punishment provided by statute. . . ." (P. 605.)

Defendant contends that the court's advisements and receipt of waivers failed to meet the requirements established by *Bunnell* in four areas. He argues that he was not fully advised as to his right to confrontation and cross-examination as well as of the likelihood of conviction on these charges. He further asserts that he was not advised, and therefore no proper waiver was taken, of his privilege against self-incrimination or his right to present evidence in his own defense. We deal with each of these contentions in turn, while noting that Attorney Braff never challenged the sufficiency of the pleas when they were entered and that Attorney Shaw did not object to their introduction at the subsequent penalty phase.

Defendant first challenges the court's explanation as to the right to confront and cross-examine witnesses, arguing that the court merely emphasized the confrontation element and failed to mention the term "cross-examination." Defendant therefore concludes that he could not have properly waived this right consistent with the standards of *Bunnell.* The record reveals that the judge told defendant that he had "the right of confrontation, which means the right to see, to hear, and to have your lawyer question all the People who testify against you, and the right to see and hear and examine any other kinds of evidence that might be used against you." The judge then explained quite specifically what a submission on the transcript involved, noting that he would read the transcript of what had taken place at the preliminary hearing in Beverly Hills Municipal Court in May, but that the witnesses themselves would not actually be on the stand again.

Defendant argues that this explanation does not adequately support a proper waiver of his Sixth Amendment right to confront and cross-examine

witnesses because of the failure to use specifically the "commonly under-stood" term of "cross-examination." ▮ However, as the People have correctly noted, we do not require that all such advisements be given in the language which is "literal constitutional terminology," but rather that the record show by direct evidence that the accused was fully aware of his rights. As such, explanations of these rights will be sufficient when they are phrased in nonlegalistic terms, comprehensible to the average layperson and when they effectively communicate to the defendant the essential character of the constitutional privileges which he is waiving, provided that the message does not require resort to inference.[11] ▮ In the instant case, we find that the trial court's advisements of the right to confront and cross-examine witnesses were adequate to meet our constitutional standards, since they effectively communicated to defendant the essential character of the privileges.

▮ Defendant next contends that the court also ignored the *Bunnell* requirement of an express waiver by the defendant of the right to present evidence. However, the language on which he relies states: "In cases in which there is to be a submission *without* a reservation by the defendant of the right to present evidence in his own defense he shall be advised of that right and an express waiver thereof taken." *(Bunnell, supra,* 13 Cal.3d at p. 605, italics added.) The trial judge in this case explicitly informed both parties that he only accepted such submissions where both sides *reserved* the right to present additional evidence or testimony. In addition, when he placed the matter on the calendar for further proceedings, the court again observed that ". . . both sides reserving the right, should they have it, to introduce additional evidence or testimony on the 11th, as they may ulti-mately decide so to do." Clearly, therefore, the stipulation entered into by the prosecution and the defense to submit the matter on the transcript of the preliminary hearing *did* reserve the right of each party to present addi-tional evidence. Thus, it was not error for the court to fail to elicit a waiver of that right.

▮ Defendant also contends that during its various advisements sur-rounding the submission of the charges on the transcript, the court erred by making only "passing mention" of the likelihood of conviction and by seeking no acknowledgment from defendant as to that probability. The People counter that this argument is faulty in two senses. First, they direct

---

[11] See *People* v. *English* (1981) 116 Cal.App.3d 361, 370 [172 Cal.Rptr. 122]; *People* v. *Bell* (1981) 118 Cal.App.3d 781, 784 [173 Cal.Rptr. 669]. Both quote language cited from *People* v. *Johnson* (1978) 77 Cal.App.3d 866, 874 [143 Cal.Rptr. 852], which was interpreting our decision in *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], certiorari denied, 398 U.S. 911, regarding the requirement of express waivers of specific constitutional rights before the court's acceptance of a guilty plea offered by a criminal defendant.

our attention to the relevant language in *Bunnell* which states: "If a defendant does not reserve the right to present additional evidence and does not advise the court that he will contest his guilt in argument to the court, the defendant shall be advised of the probability that the submission will result in a conviction of the offense or offenses charged." (*Ibid.*) Since the parties *did* reserve the right to present additional evidence, the People suggest that the court was not required to advise defendant of the probability of his conviction. Second, they point out that the trial court, though not required to, did in fact on several occasions advise defendant of this likelihood, and thus the court could not possibly have committed error. Our review of the record reveals that the People are correct and that no error occurred in this regard.[12]

 We turn finally to defendant's contention that there was "no discussion whatsoever" of his privilege against self-incrimination and that this too represented error under *Bunnell.* Once again, this contention is belied by a review of the record. The court explained to defendant that if he agreed to a submission on the transcript of the preliminary hearing, he "should do so knowing that, in effect, you'll be incriminating yourself, because the probabilities are you're going to be convicted of the robberies. . . ." Subsequent to this advisement, defendant acknowledged that he understood the consequences of his agreement to a submission on the transcript as well as the rights he was waiving in the process.

 Since we find no error under *Bunnell* in the court's handling of the decision by defendant to submit the four Beverly Hills robbery counts on the transcript of the preliminary hearing, we must also dismiss defendant's final contention in this regard—that it was error for the prosecution to offer evidence of these convictions at the penalty phase of defendant's trial.[13]

---

[12] For example the trial court stated at one point "Mr. Lucky, if we go ahead with this, the probabilities are that you're going to be convicted of those Counts." The court then repeated to defendant that he would probably be convicted of the robberies, though noting that defense counsel had indicated he would contest some of the firearm use allegations.

Moreover, the court later discussed at some length the possible prison terms that defendant might face if convicted on these counts and then addressed defendant directly: "So, if you go ahead with this sort of setup, you should expect the possibility of getting 12 years in custody, and, if you are lucky, it will be 10. . . . Do you understand that?" Defendant then replied that he did.

[13] Defendant premised this penalty phase argument on the assumption that his convictions on the submitted counts were improper for reasons outlined above. However, we find no error in the procedure by which these counts were submitted on the transcript of the preliminary hearing, nor in the court's subsequent judgment of guilty on these counts. Thus, their introduction as evidence of circumstances in aggravation at the penalty phase was proper. Section 190.3 permits the penalty jury to consider the defendant's entire record of violent criminal conduct, including the crimes found true at the guilt phase. (Factors (a), (b).)

 ██ ██ ██ Moreover, since we find no error affecting the guilt portion of defendant's trial,[14] we affirm his conviction on all charges. ██ ██ ██ Further, we also affirm the findings of special circumstances of multiple murder and murder during the course of an attempted robbery.[15]

## III. PENALTY PHASE ISSUES.

### (A) *Sufficiency of "Other Crimes" Evidence.*

As we note above, the prosecution's evidence at the penalty trial consisted solely of other instances of violent criminal activity, including incidents which had led to felony convictions. (§ 190.3, factors (b), (c).) Among other things, the prosecution sought to show that defendant had (1) assaulted and stabbed a fellow inmate while in prison in 1975, (2) shot one Luis Longworth in the back in May 1980, and (3) possessed a "shank"—a prison-made stabbing instrument—while in Los Angeles County Jail in September 1980. Defendant contends there was insufficient evidence as to each of these incidents. We consider each incident in the order presented by defendant.

### 1. *Longworth shooting.*

Luis Longworth, called as a witness by the prosecution, initially refused to answer questions. Subsequently he admitted a recent interview with a prosecution investigator, William Schaeffer. However, when pressed for details about what he had told Schaeffer, Longworth repeatedly asserted that he could not recall.

The court ruled that Longworth was feigning memory lapse to avoid admitting the truth of his prior statements to Schaeffer. The prosecutor thus

---

[14]Defendant also contended that by excluding persons invariably opposed to the death penalty under the standards of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] from the guilt phase of a capital trial, the state effectively denies a capital defendant the right to a jury composed of a representative cross-section of the community. The claim has consistently been rejected (e.g., *Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-184 [90 L.Ed.2d 137, 147-155, 106 S.Ct. 1758]; *People* v. *Fields* (1983) 35 Cal.3d 329, 374 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. (1984) 469 U.S. 862 [83 L.Ed.2d 130, 105 S.Ct. 197]), and we find no reason to discuss it further here.

[15]The jury made express findings in this case that the murders committed by defendant were intentional. These findings satisfied any statutory requirement of intent to kill as a prerequisite to death eligibility. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], partially overruling *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) They also establish a degree of culpability allowing defendant's execution under the Eighth Amendment. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386-392 [88 L.Ed.2d 704, 716-720, 106 S.Ct. 689], construing *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].)

was allowed to introduce Schaeffer's hearsay account of their conversation. (Evid. Code, § 1235; *People* v. *Green* (1971) 3 Cal.3d 981, 986-989 [92 Cal.Rptr. 494, 479 P.2d 998].) According to Schaeffer, at a jail interview three days earlier, Longworth stated he was in the Touch of Glass store in Los Angeles at 9:30 a.m. on July 7, 1980. Birty Jo Hudson, defendant's mother and the store's owner, accused Longworth of stealing from the store, and defendant held Longworth at gunpoint. Longworth ran from the store and tried to escape but was shot in the back while attempting to climb a fence. As Longworth lay on the ground, he saw defendant standing 10 or 15 feet away, holding a gun. The wound caused permanent nerve damage and impaired the use of Longworth's legs.[16]

Birty Jo Hudson confirmed that she had Longworth under citizen's arrest in her store on the morning of July 7. She said she last saw him lying on the ground behind the store after hearing gunshots. Longworth was surrounded by workers from the store's factory. Defendant was present, but Ms. Hudson said she saw nothing in his hand. She denied telling Police Officer Richard Mossler at the scene that she had seen defendant with a gun right after hearing the shots, and that defendant then ran to his Mazda RX-7 and left.

Mossler subsequently testified that Ms. Hudson had so informed him. According to Mossler, Ms. Hudson said she saw defendant, still carrying the gun, run down an alley and climb into his automobile, which she described as a Mazda RX-7.

▇▇▇ Defendant urges that one may not be found guilty of an offense if the only inculpatory evidence comes from extrajudicial statements which are repudiated at trial. The rule he proposes is too broad. In *People* v. *Gould* (1960) 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865], Justice Traynor wrote for a unanimous court that "[a]n extrajudicial identification that cannot be confirmed by an identification at the trial is insufficient to sustain a conviction in the absence of other evidence tending to connect the defendant with the crime." (P. 631.) The *Gould* rule requires reversal "when [the conviction] is based *solely* on *an* extrajudicial statement not confirmed by the witness at trial." (*In re Miguel L.* (1982) 32 Cal.3d 100, 106 [185 Cal.Rptr. 120, 649 P.2d 703], italics added.)

We have since adopted a single exception to this rule. The repudiated identification may form the basis for conviction if it was "reiterated by the witness under oath at a preliminary examination or other judicial proceed-

---

[16] According to Schaeffer, Longworth refused to testify truthfully at the penalty trial because defendant had since apologized for the incident and Longworth realized he would receive no consideration for his testimony.

ing, and there was evidence from which the factfinder could credit the witness' prior testimony over his or her failure to confirm the extrajudicial statements at trial." (*In re Miguel L., supra,* citing *People* v. *Ford* (1981) 30 Cal.3d 209, 214-215 [178 Cal.Rptr. 196, 635 P.2d 1176]; *People* v. *Chavez* (1980) 26 Cal.3d 334 364 [161 Cal.Rptr. 762, 605 P.2d 401].)[17]

As we explained in *Miguel L.,* where "no evidence" incriminates the accused save a single witness's extrajudicial statement repudiated under oath, the extrajudicial statement lacks the "traditional indicia of reliability" which attach to an accusation made under oath and subject to cross-examination in a formal judicial proceeding. (32 Cal.3d at pp. 106-107.) Here, however, there was other probative evidence "tending to connect the defendant with the crime"—Ms. Hudson's statement to Officer Mossler at the shooting scene that she saw defendant leave with a gun right after the shots were fired.

Defendant notes that, at trial, Ms. Hudson denied this declaration and its truth; he urges that one repudiated extrajudicial statement cannot corroborate another for purposes of the *Gould* rule. He cites no authority for that proposition, however, and we find no reason to adopt it in the circumstances of this case. Where, as here, a witness has the opportunity to explain or deny her prior inconsistent statement, the earlier declaration is admissible and probative for its truth. (Evid. Code, §§ 770, 1235.) Thus, Ms. Hudson's extrajudicial statement, though inconsistent with her trial testimony, is competent corroborative evidence of Longworth's extrajudicial accusation.

Furthermore, there were ample concrete bases on which the jury could evaluate the relative credibility of the prior and current statements of each witness. (See *Chavez, supra,* 26 Cal.3d at pp. 363-364.) First, Ms. Hudson's 1982 trial testimony confirmed the 1980 incident involving Longworth at

---

[17]The People assert that the *Chavez-Ford* "preliminary examination" exception applies here. We disagree. The parties concur that defendant was bound over on a charge of deadly weapon assault in connection with the Longworth shooting, and that Longworth testified at the 1980 preliminary hearing in that case. Out of the instant jury's presence, in a discussion over Longworth's invocation of his Fifth Amendment privilege in the current penalty trial, the prosecutor asserted that the transcript of the 1980 hearing showed Longworth was the only witness. However, Longworth was not impeached in the current trial by use of the 1980 transcript, and it was never introduced in evidence. As defendant notes, it is possible that at the 1980 proceeding, Longworth admitted an extrajudicial accusation of defendant but denied its truth on the stand. Even if the 1980 transcript showed an accusation under oath, the jury had no way to evaluate whether to credit Longworth's 1980 testimony over his current "failures to recall." When asked before the jury whether he had testified in the 1980 proceeding, Longworth again claimed lack of memory. Though the circumstances of his claimed memory lapses strongly suggested falsehood, the jury was not permitted, on that basis alone, to infer that he had given truthful inculpatory testimony in 1980.

the Touch of Glass store, and she placed defendant at the scene of the shooting. Her denials that she saw defendant leave with a gun, or that she so advised Officer Mossler, could be attributed to faded memory and a logical desire to help her son. The prosecution presented ample evidence through Investigator Schaeffer of Longworth's expressed reasons for declining to tell the truth at trial, and his testimony reeked of sham and evasion.[18] On the other hand, there is no indication that either Longworth or Ms. Hudson had a motive to implicate defendant falsely in their earlier statements. (Cf. *Miguel L., supra,* 32 Cal.3d at pp. 109-110.)[19] We conclude that the extrajudicial statements of Longworth were amply corroborated and thus provide legally sufficient evidence that defendant assaulted Longworth with a deadly weapon.

2. *Prison assault.*

Donald Karvonen testified that on May 6, 1975, while on duty as a guard at Duell Vocational Institute, he heard a commotion. He investigated and found defendant and another inmate, one Wyndham, engaged in a scuffle. Defendant was on top. Karvonen ordered the two to stop, but they did not comply. By the time Karvonen reached the combatants, they had stood up and were continuing to swing at each other. After the fight was stopped, it was noted that while defendant was not injured, Wyndham had suffered a stab wound in his back.

Defendant urges there is no evidence of an "unlawful" attempt to commit violent injury, an essential element of assault (see § 240). Karvonen's testimony, he asserts, shows no more than mutual combat in which defendant emerged victorious. It is sheer speculation, defendant reasons, as to who started the fight and who was acting in lawful self-defense. Since the state carries the burden of "negating" self-defense, he concludes, affirmative evidence that defendant was the aggressor is necessary to allow the claim of assault to go to the jury.

---

[18] At the prosecutor's first question, in the presence of the jury, Longworth responded, "Excuse me. Your Honor, I talked to him [i.e., the prosecutor] before and I told him that I was going to take the Fifth." After a lengthy voir dire to decide whether Longworth had a privilege not to testify, questioning resumed. Longworth initially responded with silence; when directed to answer, he admitted giving a statement about the Touch of Glass incident to Schaeffer on the preceding Friday. He then began answering "Can't remember" or "Can't recall" to each question about the details of the interview. When asked if there was any reason why he could not remember what happened last Friday, Longworth responded, "I don't know what to say, really." Admitting he had a scar on his stomach, Longworth said he "[couldn't] remember how he got it." Asked if he recalled at all being shot behind the Touch of Glass store on July 7, 1980, Longworth answered, "I may have. I can't remember."

[19] We recognize, as could the jury, the remote possibility that Ms. Hudson had implicated defendant at the scene in order to avoid suspicion that *she* was the assailant.

Defendant misapplies the law applicable to a trial for assault. ▮ The state always retains the "burden of persuasion" that an attempt to use force was unlawful. However, if the state's evidence raises no inference of justification, such as self-defense, the defendant is not entitled to an instruction on justification unless he produces evidence sufficient to raise a reasonable doubt on that issue. (*People* v. *Adrian* (1982) 135 Cal.App.3d 335, 339-341, & fn. 5 [185 Cal.Rptr. 506].) No case suggests that the People must invariably produce evidence negating self-defense in order to reach the jury on an assault charge.

▮ Voluntary mutual combat outside the rules of sport is a breach of the peace, mutual consent is no justification, and both participants are guilty of criminal assault. (See 1 Witkin, Cal. Crimes (1963) § 171, p. 163.) Thus, where the prosecution's evidence shows a jailhouse scuffle, the scene as witnessed does not suggest defendant may have been acting in self-defense, and defendant presents no evidence in mitigation, a finding of criminal assault is justified.

Even if the state must produce some evidence that defendant was an aggressor, this record is adequate on that score. Defendant had the superior position in the scuffle, and Wyndham suffered the only injury—a stab wound in the back. There is no evidence that more than one weapon was involved in the fracas. The position of the stab wound under these circumstances permits an inference that defendant struck first. The jury could also infer that, even if the brawl was initiated by Wyndham, defendant used excessive retaliatory force when, though uninjured, he wielded the only known weapon and continued to pummel Wyndham after pinning him. The evidence of an assault on Wyndham was sufficient for jury consideration.[20]

3. *Possession of shank in county jail.*

▮ Section 4574, subdivision (a), provides among other things that any jail inmate who possesses a deadly weapon without authorization is guilty of a felony. Knowledge is an essential element of the offense. (E.g., *People* v. *Gory* (1946) 28 Cal.2d 450, 455 [170 P.2d 433].) Deputy Sheriff Robert Troy testified that on September 30, 1980, he and two other officers searched defendant's cell in Los Angeles County Jail. Defendant shared the four-man cell with two other inmates. He occupied the upper right bunk. Four or five

---

[20] Defendant urges that mere "inferences" from ambiguous evidence about defendant's status as an aggressor are not reliable enough to inform the sentencer's choice between the extreme penalties of death and life without parole. The due process interest in reliability is served, however, by the required instruction, given in this case, that the jury must find true beyond a reasonable doubt any criminal activity used as an aggravating factor. (*Robertson, supra,* 33 Cal.3d at pp. 53-54.)

feet above defendant's bunk, hidden on top of the bars, the deputies found two "wire-type . . . shank[s]," six to eight inches long, made from pieces of straightened and sharpened bedspring. Two other similar weapons were discovered hidden near the lower left bunk, away from the space occupied by defendant.

Defendant urges that this mere access to the shanks in a shared cell is insufficient evidence that he knowingly possessed them. He ignores that two of the weapons were found nearest his bunk, in a relatively inaccessible area where the jury could infer he had exclusive control. The evidence of knowing possession was sufficient.

(B) *Prosecutor's Argument That "Life" Sentence Might not Protect "Society" and That Defendant Might Escape.*

At the penalty phase, the prosecution introduced exhibit 14, a record of defendant's 1972 rape and robbery convictions which had resulted in an indeterminate sentence of 10 years to life. In his closing argument, seeking to show that life without parole was an inadequate penalty, the prosecutor held up a document before the jury and said, "You can look at this exhibit, see how good a life sentence is. Think about the exhibit, and tell Mr. Odel and Mr. Toran [the murder victims in the present case] how good a life sentence is to protect society."[21]

At an earlier point in his argument, the prosecutor commented, "What would society be like if the defendant should, God forbid, escape from prison if he got life without the possibility of parole? How safe would we be?" There was no evidence at either the guilt or penalty phase that defendant had ever completed, attempted, or planned an escape.

Defendant urges that, by inviting comparisons to an "indeterminate" life sentence, the prosecutor's comments about the worthlessness to "society" of

---

[21] The reporter's transcript does not disclose what "exhibit" the prosecutor was displaying. The quoted comment came shortly after the prosecutor's argument that, even if defendant was ineligible for parole, his history demonstrated he was a danger to any society in which he might live, including prison society. At one point, the People suggested the prosecutor might thus have been holding and referring to People's exhibits 17, 18, or 19, photographs of the assaulted inmate Wyndham, and that he was simply claiming a sentence of life without parole would not eliminate defendant's danger in the prison community. (See discussion, *post.*) Defendant thereafter filed a motion to settle the record in this respect. The motion includes a declaration by Richard Neidorf, the prosecutor who tried the case, that he was holding and referring to exhibit 14. The people filed no response to the motion. We thus deem the record settled and augmented as requested. (See Cal. Rules of Court, rule 12(a).)

Exhibit 14 does not refer on its face to a "life" sentence, but only to the "term prescribed by law." The record discloses no references by the prosecutor to a prior "life" sentence except in his closing argument.

a "life" term improperly misled the jury about the consequences of a sentence of life without possibility of parole. (See, e.g., *People* v. *Ramos* (1984) 37 Cal.3d 136, 153-154 [207 Cal.Rptr. 800, 689 P.2d 430] (hereafter *Ramos II*); *People* v. *Seiterle* (1961) 56 Cal.2d 320, 323-324 [14 Cal.Rptr. 681, 363 P.2d 913]; *People* v. *Smith* (1973) 33 Cal.App.3d 51, 70-71 [108 Cal.Rptr. 698].) He further asserts that the "escape" reference had no evidentiary foundation and, in any event, injected irrelevant speculation into the jury's sentence deliberations. (See, e.g., *Ramos II, supra,* at pp. 155-159; *People* v. *White* (1968) 69 Cal.2d 751, 762 [72 Cal.Rptr. 873, 446 P.2d 993]; *People* v. *Morse* (1964) 60 Cal.2d 631, 642-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)

Admonitions would have cured any impropriety in these remarks, however. Defendant's failure to object thus waives any issue of misconduct on appeal. The rule that failure to object to curable misconduct constitutes a waiver applies at the penalty phase as well as at the guilt trial. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 108 [241 Cal.Rptr. 594, 744 P.2d 1127]; see *People* v. *Ghent* (1987) 43 Cal.3d 739, 770 [239 Cal.Rptr. 82, 739 P.2d 1250]; *Green, supra,* 27 Cal.3d at p. 27.)

Defendant asserts that the failure to object constituted ineffective assistance of counsel. (See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 583 [189 Cal.Rptr. 855, 659 P.2d 1144].) Still, no basis appears for reversal on appeal. The appellate record fails to establish a claim of ineffective assistance, since it suggests plausible tactical grounds for the failure to object. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Admonitions to the jurors risked focusing their thoughts on precisely the thing they were being told to disregard.

In any event, defendant was not legally prejudiced by any lapse in his counsel's performance. (*Fosselman, supra,* 33 Cal.3d at p. 584; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674, 697, 104 S.Ct. 2052].) Assuming the prosecutor's remarks were improper, we find them harmless under any applicable standard of prejudice. Indeed, the "life sentence" remark, heard in context, apparently was not an impermissible reference to the possibility of defendant's later *release;* rather the prosecutor stressed throughout that defendant's past violent crimes, including the capital murders, suggested a potential for future violence against "prison society," both inmates and those "who work in state prisons for a living."[22]

---

[22] Insofar as the prosecutor was arguing defendant's future dangerousness in custody, his remarks were proper. Defendant's past violent crimes, introduced under one of the specific aggravating categories of section 190.3 (factor (b); see *People* v. *Boyd* (1985) 38 Cal.3d 762, 771-776 [215 Cal.Rptr. 1, 700 P.2d 782]), amply supported such an argument. Nor did the

The prosecutor never commented that defendant had been released from a prior "life" sentence, or that he might be released despite a life sentence "without parole." Under all the circumstances, it seems extremely unlikely the prosecutor's remark caused any juror serious concern about the possibility of defendant's release in the event he was not executed.

 In any event, the prosecutor's statements, including the reference to escape, were relatively brief and mild. (*Ghent, supra,* 43 Cal.3d at pp. 770-771.) We have made clear that even if *Ramos II*-style error is reversible per se when embodied in a court instruction, prosecutorial argument, if not emphasized, may be deemed harmless. (*Ibid.*) The prosecutor's remarks do not warrant reversal of the penalty judgment.[23]

(C) *Admissibility of Defendant's Juvenile Misconduct as Aggravating Evidence*

The prosecution introduced evidence that in February 1972, while defendant was still a minor, he and two other suspects, Spencer and Harris, were arrested in connection with the armed robbery of a Torrance liquor store. In the car in which the three were arrested, police found checks made out to the victim's business, a bank bag containing $900, a bloodstained revolver, store receipts, and the victim's wallet. The arrest report, admitted without objection, indicated that Harris pointed a gun at the store's owner and hit him, Spencer tied up the victim and took money from the registers, and defendant acted as a lookout. According to juvenile court records also placed in evidence, defendant admitted a violation of section 487, subdivision 2 (grand theft person), in connection with this incident.

Defendant urges that his juvenile misconduct disposed of in a juvenile proceeding is inadmissible under either factors (b) or (c) of section 190.3, since it is neither a "prior felony *conviction*" (factor (c)) nor "*criminal* activity" involving violence (factor (b)). (Italics added.) We observe at the

---

prosecutor's comments violate our holding in *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446] that expert psychiatric predictions of future dangerousness are inadmissible. (*Miranda, supra,* 44 Cal.3d at p. 111; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].)

[23] We recognize that *White, supra,* found reversible error in prosecutorial references to possible escape. (69 Cal.2d at pp. 762, & fn. 5.) *White* applied the very generous rule of penalty phase prejudice applicable to pre-1972 death penalty statutes. In view of the jury's "absolute" penalty discretion under these laws, any "substantial" penalty phase error was deemed prejudicial and reversible. (*Id.,* at p. 763.) This strict standard of penalty phase reversal no longer applies, however, under the 1977 and 1978 death penalty laws, which include constitutionally sufficient standards to guide jury discretion. (*Robertson, supra,* 33 Cal.3d at p. 63 [conc. opn. of Broussard, J.]; see *Davenport, supra,* 41 Cal.3d at pp. 280 [plur. opn.] & 295 [conc. & dis. opn. of Broussard, J.].) Under any currently applicable standard, we need not reverse for a minor reference to escape in the course of argument.

outset that defendant made no objection to evidence of the 1972 incident, and direct challenges to its admission must therefore be deemed waived. (*Green, supra,* 27 Cal.3d at p. 27.)

Defendant's argument is no more persuasive if considered as a claim of ineffective assistance. In the first place, failures to object to evidence rarely demonstrate incompetence on the face of the appellate record. (*Ghent, supra,* 43 Cal.3d at p. 772.) Here, moreover, the claim of inadmissibility is incorrect on its merits.

As defendant notes, there is a well-understood distinction between a juvenile wardship adjudication on the one hand, and adult criminal proceedings leading to a "felony conviction" on the other. (E.g., *People v. Weidert* (1985) 39 Cal.3d 836, 844-845 [705 P.2d 380]; *In re Joseph B.* (1983) 34 Cal.3d 952, 955 [196 Cal.Rptr. 348, 671 P.2d 852]; *In re Michael S.* (1983) 141 Cal.App.3d 814, 817 [190 Cal.Rptr. 585].) However, juvenile court disposition is no bar to admission under factor *(b)* of a penal violation involving the threat of force or violence.

Defendant concedes that the violent "criminal activity" described in factor (b) need not have produced a "conviction." He points out, however, that it must constitute an "actual crime." (See *People v. Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423]; *Boyd, supra,* 38 Cal.3d at p. 778.) He urges that juvenile misconduct leading to a juvenile adjudication cannot be considered a "crime" for any purpose.

Defendant is mistaken. As we noted in *Phillips, supra,* 41 Cal.3d 29, the legislative history of the identical factor (b) of the *1977* law makes clear that, with respect to past *violent* acts, admissible "criminal activity" includes evidence of misconduct, regardless of "conviction, which amounts to an "actual crime, *specifically, the violation of a penal statute,* " so long as defendant was not "acquitted." (41 Cal.3d at pp. 71-72, italics added; see also *Balderas, supra,* 41 Cal.3d at p. 201, & fn. 28 [1978 law].) The Juvenile Court Law expressly provides that a minor is eligible for wardship status "when he violates any law . . . or . . . ordinance . . . defining crime. . . ." (Welf. & Inst. Code, § 602.) ▮▮ Contrary to defendant's assertion, nothing in the 1977 or 1978 laws indicates an intent to exclude violent criminal misconduct while a juvenile as an aggravating factor, simply on grounds the misconduct resulted in a juvenile wardship adjudication.[24]

---

[24] The statutes provide, of course, that a juvenile adjudication "shall not be deemed *conviction* of a crime for any purpose. . . ." (Welf. & Inst. Code, § 203, italics added.) However, introduction of the *underlying violent juvenile misconduct* as "violent" criminal activity under section 190.3, factor (b), does not violate that proscription. It is not the adjudication, but

Finally, even if cognizable error had occurred, it was harmless under any applicable standard. The prosecutor effectively urged the jury *not* to give the juvenile matter serious weight. He noted that it was "a long time ago," that defendant was then a juvenile and that defendant's participation was comparatively "minimal." Further, the prosecutor suggested, the victim's testimony was absent, "[s]o you really only have half the story," and he said the jury should construe any unknown facts in defendant's favor. "In hindsight," the prosecutor summarized, "it may have been a mistake to bring up the event, but I just don't know if you have enough facts about that event to really use it against the defendant. ¶ Look at it. Evaluate it. If I am wrong, give it whatever weight you think it deserves." We find no basis for reversal.

(D) *Unanimous Agreement on Aggravating Criminal Activity.*

 Defendant urges the trial court should have instructed sua sponte that the jury must unanimously find true each crime used as an aggravating factor. We have consistently rejected the contention that unanimity on aggravating crimes is necessary. (*Miranda, supra,* 44 Cal.3d at p. 99; *Ghent, supra,* 43 Cal.3d at pp. 773-774.)

(E) *Scope of Mitigating Evidence and Sentencing Discretion.*

Defendant urges that a series of "interrelated" instructional errors and omissions impermissibly limited both the relevant mitigating evidence and the jury's ultimate discretion to reject death as an inappropriate penalty in his individual case. We disagree.

 Defendant first notes that the trial court modified the standard "aggravating-mitigating circumstance" instruction (CALJIC No. 8.84.1) to omit reference to "the effects of intoxication" as reducing culpability for the capital crime. (See § 190.3, factor (h).) As the People note, however, there was no evidence that defendant had consumed intoxicants around the time of the capital offense, or that his capacity to appreciate wrongfulness or behave lawfully was thus diminished. Defendant urges the jury could have inferred he was so affected at that moment because of extensive general testimony about his history of serious drug abuse. We are not persuaded. (See, e.g., *People* v. *Frierson* (1979) 25 Cal.3d 142, 155-157, 159 [158

the conduct itself, which is relevant. Moreover, both California and other jurisdictions with similar laws have long assumed that they do not preclude consideration of a defendant's juvenile record for purposes of enhanced adult sentencing. (See, e.g., §§ 1191, 1203; *People* v. *Meza* (1971) 14 Cal.App.3d 553, 555 [92 Cal.Rptr. 423]; *People* v. *Booth* (1962) 210 Cal.App.2d 443, 446 [26 Cal.Rptr. 717]; *People* v. *McFarlin* (1973) 389 Mich. 557 [208 N.W.2d 504, 512-514, 64 A.L.R.3d 1274]; *Commonwealth* v. *Myers* (1958) 393 Pa. 224 [144 A.2d 367, 369-370]; see generally Annot. (1975) 64 A.L.R.3d 1291.)

Cal.Rptr. 281, 599 P.2d 587]; *People* v. *Carr* (1972) 8 Cal.3d 287, 294-295 [104 Cal.Rptr. 705, 502 P.2d 513].)[25]

■ Defendant next complains that factor (d) of section 190.3 and the standard instruction permit the jury to consider only "extreme" mental or emotional disturbance in mitigation. As we have noted, however, another factor of section 190.3, also included in the standard instruction, allows consideration of "[*a*]*ny* other circumstance which extenuates the gravity of the crime, . . . ." (Factor (k) (italics added); see CALJIC No. 8.84.1, factor (k).) This "catchall" provision "is sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense. . . ." (*Ghent, supra,* 43 Cal.3d at p. 776.)

There is no evidence the instant jury was misled. Both counsel based their penalty arguments on broad consideration of all the evidence. While the prosecutor urged the jurors to follow the law, he never suggested that emotional disturbance was irrelevant unless it was "extreme." On the contrary, he confronted defendant's "mental" evidence on its merits. (See discussion, *post.*) We find no indication the jury may have given improper mitigating weight to any evidence of defendant's emotional disturbance.

Defendant complains he was prejudiced by the omission of an instruction that the jury could consider in mitigation not only "any . . . circumstance which extenuates the *gravity of the crime*" (§ 190.3, factor (k); CALJIC No. 8.84.1, former factor (k), *supra,* italics added), but "any . . . 'aspect of [the] defendant's character or record . . . that [he] proffers as a basis for a sentence less than death.'" (*People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10[26] [196 Cal.Rptr. 309, 671 P.2d 813]; see *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].) Further, he urges, the court should have instructed sua sponte that "sympathy" was a relevant factor in mitigation regardless of the evidence. He also suggests it was error to instruct at the penalty phase that the jury must reach a "just" verdict, "regardless of . . . the consequences. . . ." (CALJIC No. 1.00.)

---

[25] In *Ghent, supra,* 43 Cal.3d 739, we rejected a defense argument that mitigating factors which do not appear from the evidence *should be deleted* from the instructions. In so doing, we noted in passing that "deletion of any potentially mitigating factors from the statutory list could substantially prejudice the defendant. . . ." (43 Cal.3d at pp. 776-777.) Our use of the term "prejudice" in the practical sense did not imply that defendant is *entitled* to an instruction on all potentially mitigating factors, regardless of the evidence, or may assert error when such a factor is omitted.

[26] In *Easley,* this court noted that the "unadorned" language of factor (k), as reproduced in former standard instructions, does not clearly invite the jury to consider proffered mitigating evidence which does not relate directly to the capital crime. *Easley* imposed a prospective requirement that the relevant instructions be modified to make clear the full constitutional scope of relevant mitigating evidence.

■ The United States Supreme Court, however, has recently made clear that an instruction *prohibiting* "mere" or "factually untethered" sympathy as a sentencing consideration is constitutionally proper. (*California* v. *Brown* (1987) 479 U.S. 538, 540-541 [93 L.Ed.2d 934, 939-940, 107 S.Ct. 837 (plur. opn.)], 544-545 [93 L.Ed.2d at p. 942 (conc. opn. of O'Connor, J.)]. A fortiori, an instruction urging the relevance of such "untethered" sympathy is not required. (See also *Miranda, supra,* 44 Cal.3d at p. 102.) Moreover, insofar as an "ignore consequences" instruction "can be understood by the jury in the same light as an admonition to disregard sympathy" (see *People* v. *Brown* (1985) 40 Cal.3d 512, 537, fn. 7 [220 Cal.Rptr. 637, 709 P.2d 440]), the Constitution does not forbid it.

■ The sentencer, however, must be adequately informed of its responsibility to consider all mitigating evidence defendant proffers. (*California* v. *Brown, supra,* 479 U.S. at p. 546 [93 L.Ed.2d at p. 943 (conc. opn. of O'Connor, J.)].) The instructions and arguments must be examined as a whole to determine whether the jury received adequate information in this respect. (*Ibid.*)

Such an examination here persuades us that the jury must have understood the relevant scope of mitigating evidence. In this pre-*Easley* case, the jury received the standard "catchall" instruction referring to extenuation of the capital crime and was not expressly told to consider general character and background evidence in mitigation. The jury was instructed, however, to consider "all of the evidence" received at either stage of the trial when determining the appropriate penalty. It received no "antisympathy" instruction.

Without objection, defense counsel elicited substantial evidence of defendant's drug and mental history from his mother (who appeared as a prosecution witness). Counsel also introduced certain of defendant's state hospital records. Counsel's arguments were based entirely on the assumption that the jury must decide whether or not defendant deserved the death penalty under all the circumstances, including defendant's background and general considerations of humanity. Nothing in either argument suggested that the mitigating "circumstances" the jury could consider were limited in any way.

Indeed, the prosecutor addressed defendant's mental evidence on its merits. He conceded that, if believed, this evidence might show defendant "deserve[s] some sympathy, compassion in mitigation, but he actually deserves none." The medical records would show, the prosecutor argued, that defendant's mental problems were mostly feigned. The prosecutor encouraged the jurors to study this issue carefully, "to take some time, [because] defend-

ant deserves the time," and to "[s]atisfy [themselves] that defendant's mental [and drug] problems are created by himself. . . . He faked them himself. . . ."

Defense counsel, on the other hand, was allowed to argue without objection that the jury should show mercy either because or in spite of defendant's record and background. Under all the circumstances, we must conclude the jury was adequately informed about the relevant scope of mitigating evidence.

Finally, defendant asserts that the "unadorned" instructions on "weighing" aggravating and mitigating factors (§ 190.3; CALJIC, former No. 8.84.2) failed to explain the jury's ultimate responsibility to decide for itself whether death or life without parole was the appropriate penalty in the particular case. (See *People* v. *Brown, supra,* 40 Cal.3d at pp. 542-545.) Under the circumstances, we believe the jury was adequately informed about the scope of its sentencing discretion.

 As defendant notes, the 1978 statute provides that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" mitigating. In particular cases, jurors instructed without further explanation in this statutory language may be unsure about the breadth of their sentencing responsibilities under the Eighth Amendment. They may believe the "weighing" process (1) is mechanical rather than normative and, (2) once completed, automatically determines the penalty regardless of the jurors' views on appropriateness. (*People* v. *Myers* (1987) 43 Cal.3d 250, 274-275 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Brown, supra,* 40 Cal.3d at p. 542, and fn. 13; see also *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633].)

In *People* v. *Brown, supra,* we endorsed clarifying instructions for use in future cases. (40 Cal.3d at p. 545, fn. 19.) However, we must still examine each earlier trial on its own merits to determine, "in context," whether the jury was adequately informed about the full scope of its sentencing power and responsibility. (*Id.,* at p. 544, fn. 17.)

We find no potential for confusion here. First, the trial judge deviated in a crucial way from the statutory language and then-standard instruction by telling the jurors they "may," not "shall," impose the death penalty if they found that aggravating circumstances outweighed mitigating. Thus, the jurors were directly told that they were free to reject death as inappropriate under the circumstances even if they believed aggravating evidence predominated over mitigating. In this way, the court's instruction adequately

conveyed the principle that the jury had the ultimate duty and responsibility to determine, by its own values, the proper penalty in the individual case.

Moreover, as noted, counsel's arguments proceeded on the assumption that the jury was to decide the morally appropriate punishment. For example, the prosecutor stressed at the outset that however each juror had felt when he voted on the death penalty initiative, now he faced personal responsibility for applying it. "It's not going to be someone else that's going to be doing it," he said, "it's going to be you. And it's going to be hard, it's going to be very hard. And it should be hard. It should not be an easy task, it should not be an easy decision. [¶] Our whole way of life and the law is to make it difficult, and should make it difficult, to come back with a verdict of death." The prosecutor then asked the jurors to balance "society's rights against those of defendant and urged that defendant's violent past made him a poor risk for safe confinement.

The prosecutor did urge the importance of following the law and he did suggest at one point that the penalty was determined by whether the aggravating or the mitigating factors "win" in the weighing process. Immediately, however, he qualified that statement with the following declaration: "Although it is, undoubtedly, a natural feeling—and I would have the same feeling if I were on the jury, that if it was 50-50, or even 51 percent in favor of aggravation, it would be very hard to vote for death. *You probably are going to require a lot more than 51 percent when you start weighing the factors in aggravation and mitigation. Maybe that's human nature. . . .*" (Italics added.) Thus, the prosecutor focused jurors on the fact that the balance of aggravating and mitigating circumstances was "not between good and bad but between life [without parole] and death" (*People* v. *Brown, supra,* 40 Cal.3d at pp. 541-542, fn. 13), and he invited them to employ their individual consciences in deciding the appropriate penalty.

In sum, the prosecutor suggested that society "could not handle" and did not have to "accept" defendant's unending violence; it could say "[e]nough is enough." ■■ ■■■■ He characterized defendant as ultimately a "worthless human being" who "deserves to die."[27]

Defense counsel, on the other hand, contended among other things that it was unfair to execute defendant for society's problems, that something "positive" may come from the darkest soul, that the death penalty is

---

[27] In the context of this entire argument, we attach no fatal effect to the prosecutor's passing remark that "[y]ou personally will not be giving the defendant a death sentence. The defendant has earned the death sentence that you will pass upon him." A reasonable juror could only have interpreted this statement to suggest that the extreme nature of defendant's misconduct made the death penalty inevitable at the hands of *any* jury.

ineffective as a deterrent, and that execution is an "animalistic" way for a civilized society to punish its "misfits." ▇▇▇ Under all these circumstances, the jury cannot have been misled about its ultimate power and duty to determine the appropriate penalty from all the proffered evidence. There is no basis for reversal of the penalty judgment.[28]

(F) *Double-counting of Multiple-murder Special Circumstances.*

Defendant was charged with a multiple-murder special circumstance (§ 190.2, subd. (a)(3)) in connection with the charged murder of *each* homicide victim; the murder of Toran was alleged as a multiple murder to the killing of Odel, and the murder of Odel was alleged as a multiple murder to the killing of Toran. Both multiple-murder special circumstances were found true. ▇▇▇ Defendant urges he was thereby prejudiced at the penalty phase, since factor (a) of section 190.3 instructs the jury to consider "any special circumstance found . . . true. . . ." (See also CALJIC, former No. 8.84.1, factor (a).) He asserts the jury may thus have considered *each* multiple-murder special circumstance as a separate factor in aggravation, though there was really only one "multiple" murder.

We have condemned the "double-charging" of multiple murders. (*People v. Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433] [plur. opn.]; see also *People v. Rodriguez* (1986) 42 Cal.3d 730, 787 [230 Cal.Rptr. 667, 726 P.2d 113].) However, the practice is no basis for reversal of the penalty judgment when there is no real chance the jury was misled to believe it should "double-count" these circumstances when deciding the appropriate penalty. (*Rodriguez, supra,* at pp. 787-788.)

Here, as in *Rodriguez,* the jury knew how many murders had actually been committed. "Nothing at trial, or in the arguments or instructions, was calculated to create [the] impression" that the *two murders* were more heinous because *two multiple-murder special circumstances* had been alleged and found true. (*Id.,* at p. 788.) There is no indication the jury so believed. We find no grounds for reversal.

(G) *Failure of Instructions to Specify That Defendant's Age Can Only Be a Mitigating Factor.*

▇▇▇ Defendant notes that section 190.3 and the parallel standard instruction include "[t]he age of the defendant at the time of the crime"

---

[28] The presence of the "ignore consequences" instruction does not alter our analysis. If this instruction were read to discourage concern about the "penalty consequences" of the "weighing" process, it might possibly lead jurors to doubt their ultimate responsibility for deciding the "appropriate" penalty. Reversal is not warranted, of course, if all the circumstances make clear the jury was adequately apprised of its sentencing responsibility. Such is the case here.

among the factors the jury is to consider in aggravation or mitigation. (Factor (i).) He urges that age can only be a mitigating factor, and instructions on the "age" factor are erroneous unless they so specify.

We disagree. It is true that "mere chronological age . . . should not *of itself* be deemed an aggravating factor." (*Rodriguez, supra,* 42 Cal.3d at p. 789, italics added and deleted; accord, *Allen, supra,* 42 Cal.3d at pp. 1283-1284 (lead opn. of Grodin, J.); *Ghent, supra,* 43 Cal.3d at pp. 775-776 [discussing identically worded factor under 1977 death penalty law, former Pen. Code, § 190.3, Stats. 1977, ch. 316, § 11, p. 1260].) By the same token, mere chronological age of itself should not be deemed a mitigating factor. Age alone is plainly "a factor over which one can exercise no control" (*Rodriguez, supra,* at p. 789) and as such is not relevant to the issue of penalty. This is the core of the lesson that *Rodriguez, Allen,* and *Ghent* teach.

In our view, the word "age" in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case.

By contrast, defendant's proposed instruction improperly suggests that inferences related to the defendant's age, no matter how relevant to the appropriate sentence, can only be considered if they weigh against, rather than for, the death penalty. Defendant's contention must therefore be rejected.

(H) *Admissibility of Evidence.*

■ The prosecutor presented testimony from Kenneth Ryder, a parole officer who had supervised defendant's parole from mid-1979 to mid-1980. Choosing not to question Ryder about any specific acts of misconduct, the prosecutor instead asked whether defendant had been "easy to supervise on parole." Ryder responded, "No. . . . Mr. Lucky was manipulative, avoided supervision, making merely enough contact to avoid what we call a suspension for absconding. Most contacts, however, were by telephone, very few were by actual visitation." Parole Officer Ryder also testified that he believed defendant was addicted to narcotics.

Such testimony clearly relates to defendant's character and background, but it does not bear upon any of the specific aggravating or mitigating factors listed in the 1978 statute. It is settled, of course, that the prosecution may not in its case-in-chief introduce evidence of defendant's background or character which is not probative of any specific aggravating factor.

(*Rodriguez, supra,* 42 Cal.3d at p. 791; *Boyd, supra,* 38 Cal.3d at p. 775.) Thus, the trial court erred in permitting the prosecution to introduce the testimony of Mr. Ryder.

The error was not prejudicial, however, under any applicable standard. The penalty jury heard ample proper evidence of defendant's long and violent criminal history. That he was not particularly well-behaved on parole cannot have come as much of a surprise. There is no basis for believing admission of Mr. Ryder's testimony affected the penalty verdict.

(I) *Constitutionality of 1978 Death Penalty Law.*

Defendant urges that the 1978 death penalty law is unconstitutional insofar as it lacks the following requirements: (1) a jury finding beyond a reasonable doubt that aggravation outweighs mitigation and death is the appropriate penalty, (2) specific enumeration of which statutory factors are aggravating and which mitigating, (3) express exclusion of nonstatutory aggravating factors, and (4) jury unanimity as to any aggravating factors found in support of a death sentence. We have consistently rejected similar attacks on both the 1977 and 1978 laws. (*Miranda, supra,* 44 Cal.3d at pp. 99, 107; *Allen, supra,* 42 Cal.3d at p. 1285; *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *Jackson, supra,* 28 Cal.3d at pp. 315-317 [plur. opn.], 318-319 [conc. opn. of Newman, J.] [1977 law]; *Frierson, supra,* 25 Cal.3d at pp. 176-180 [plur opn.] [same].)

(J) *"Cumulative" Effect of Alleged Penalty Phase Errors.*

Defendant asserts that even if no single error caused sufficient prejudice to warrant reversal, the "cumulative" effect of asserted errors casts fatal doubt on the reliability of the death verdict. We disagree. We have identified three "errors" at the penalty phase: (1) the prosecutor's "life sentence" and "escape" references, (2) the "double charging" of multiple-murder special circumstances, and (3) admission of the Ryder testimony as to nonstatutory aggravating factors.

Even in combination, these errors do not warrant reversal. As we have noted, the jury was adequately informed under all the circumstances of the scope of its sentencing discretion, and of the relevant mitigating evidence. The capital crimes were brutal; defendant personally committed two premeditated murders to eliminate witnesses to an armed robbery. The unrebutted evidence of defendant's violent 10-year criminal history included participation in a gang rape with personal use of a handgun, a number of armed robberies, a prior shooting, and several instances of prison violence. The jury heard that defendant had threatened and wounded his own mother

and a friend with a shotgun. The mitigating evidence, which was substantial but not extensive, centered around possible drug and mental problems. Under these circumstances, we are not persuaded that the cumulative effect of the errors identified could have affected the verdict.

IV. CONCLUSION

We find no error warranting reversal at either the guilt or penalty phases of defendant's trial. We therefore affirm the judgment in its entirety.

Lucas, C. J., Mosk, J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the affirmance of the guilt phase and in the finding of special circumstances. I dissent to the imposition of the death penalty.

In a prior opinion in this case, we identified four penalty phase errors: (1) the court's failure to instruct the jury specifically to consider and weigh defendant's mitigating evidence of character and background; (2) its direction that the jury disregard the consequences of its verdict; (3) its instructions permitting the jury to regard the murders as two special circumstances instead of a single circumstance of multiple murder; and (4) the admission of testimony of defendant's poor performance on parole. The present majority opinion acknowledges all but the first of these errors.

With respect to that error—the failure to instruct the jury to weigh mitigating character and background evidence under factor (k) of the 1978 death penalty law (Pen. Code, § 190.3, factor (k))—the majority rejoin that the jury was instructed to consider "all" the evidence. Our prior opinion explained, however, that "the court directed the jury only to 'consider' that evidence as part of the mass of evidence received during both the guilt and penalty phases, but called attention specifically to the statutory factors, directed the jury not only to 'consider' but to 'weigh' those factors, and told it to determine the penalty on the basis of the weight assigned. Thus, as in *People* v. *Lanphear* [1984] 36 Cal.3d 163, 168, fn. 1 [203 Cal.Rptr. 122, 680 P.2d 1081], 'the instructions suggest to the jury that mitigating evidence relevant to the defendant's character and background, which may give rise to sympathy, is not entitled to the same consideration in weighing mitigating against aggravating factors as evidence that extenuates moral culpability.'" (See *People* v. *Frank* (1985) 38 Cal.3d 711, 748-751 [700 P.2d 415] (Bird, C. J., conc. and dis.).)

The new majority, however, makes up for this lapse by calling attention to another error. The prosecutor argued that defendant should be given the

death penalty because, if imprisoned for life without possibility of parole, defendant might escape, and then "how safe would we be?" As Chief Justice Traynor explained in *People* v. *White* (1968) 69 Cal.2d 751, 762 [72 Cal.Rptr. 873, 446 P.2d 993], such an argument "erroneously invited the jury to speculate . . . as to the possibility that in the future prison officials might be ineffective in the discharge of their duties and permit defendant to escape." Such speculation diverts the jury from its duty to determine which penalty, death or life imprisonment without possibility of parole, is appropriate for the defendant. (*Ibid.*)

As we concluded in our prior opinion, "[e]ach of these errors relates to a significant legal issue; each contains a small but real possibility of affecting the result." When the cumulative effect of all the errors is considered, the likelihood that one or more played a part in leading the jury to return a death verdict is sufficient for us to find a reasonable possibility that, absent error, defendant would not have been sentenced to die. I would therefore reverse the penalty verdict and remand the case for a new penalty trial.

Appellant's petition for a rehearing was denied July 21, 1988.