Filed 6/25/13  P. v. Johnson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH DWAYNE JOHNSON,<br><br>    Defendant and Appellant. | A132653<br><br>(Contra Costa County<br>Super. Ct. No. 51007640) |

Defendant Kenneth Dwayne Johnson appeals from a judgment of conviction for resisting an executive officer and three misdemeanor batteries, for which he received probation, subject to certain terms and conditions.  He argues the judgment must be reversed because he was deprived of his rights to effective assistance of counsel and to present a defense, and because the trial court abused its discretion in denying his various *Marsden* motions.  We affirm the judgment.

**BACKGROUND**

In a July 2009 complaint, the Contra Costa County District Attorney alleged that earlier that same month, defendant had committed two felony counts of assault by force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)),[1] two counts of misdemeanor battery (§§ 242/243, subd. (a)), resisting an executive officer (§ 69), and refusing to give specimens, samples or print impressions (§ 298.1, subd. (a)).

Defendant pled not guilty to all counts.  Deputy Public Defender Ilean Baltodano was appointed to represent him, did so for about 10 months, and later was reappointed to

_____

[1]  All statutory references are to the Penal Code unless otherwise stated.

1

represent him at trial. At the center of this appeal are defendant's contentions that Baltodano did not provide adequate representation because she acted repeatedly to delay his preliminary hearing and trial, and refused to investigate and advocate an involuntary intoxication defense, against his wishes. He filed five motions pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) that were denied, and retained private counsel and represented himself briefly before Baltodano represented him at trial.

### *Preliminary Hearing Continuances*

The court repeatedly continued defendant's preliminary hearing from August 2009 until its occurrence in July 2010. Defendant asserted below that he did not waive his right to a timely hearing, but the record indicates otherwise. On August 11, 2009, the court stated to him, "you have the right by law to have a preliminary hearing within 10 days of your not-guilty plea. And the right to have it [con]cluded within 60 days of that not guilty plea. You are now going beyond that time. Is that agreeable [with] you?" Defendant said, "Yes." The court continued his hearing until October 2009.

The court granted continuances in October and December 2009, with counsel's agreement, for unstated reasons. Baltodano acknowledged defendant's waiver of a speedy preliminary hearing. In February 2010, the court granted another continuance because Baltodano was in a continuing jury trial.

In March 2010, the prosecutor filed a written motion, supported by an affidavit from the prosecutor, requesting a continuance because a material witness, an investigating officer, was on medical leave. Baltodano, while acknowledging defendant's time waiver, opposed the request because defendant would incur a bail renewal fee if the case was not completed by June 2010. The court granted the continuance.

On April 27, 2010, the prosecutor orally requested a brief continuance because, she stated, a primary witness was ill and another investigating officer was on paternity leave. Baltodano opposed it because of defendant's costs to come to court repeatedly, and because he would soon incur an additional $7,000 bail fee. The court granted a

2

continuance to May 5, 2010.  Baltodano said that at the next hearing she would move to reduce or eliminate bail, which had been set at $71,000 after defendant's arrest.

### Defendant's First Marsden Motion

At the May 5 hearing, Baltodano told the court she could not appear for defendant's preliminary hearing for two days because of a work conflict and thereafter both she and the prosecutor were assigned to a four-week homicide trial.  She said defendant had requested another attorney take over the case, but that this was not possible in her office.

Defendant then made his first *Marsden* motion.  He argued his right to a speedy trial was being violated, he had not waived his right to a speedy preliminary hearing, and Baltodano was not prepared to proceed with his case because of work conflicts.  The court, Judge Steven K. Austin presiding, deferred ruling on the motion until May 12 so it could review the transcript to determine if defendant had waived time.

On May 12, 2010, the parties appeared before the court, Judge John H. Sugiyama presiding.  Defendant indicated he wanted to make a motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).  In the ensuing discussion, the court indicated its understanding that another judge had denied defendant's *Marsden* motion.  When it sought "further assurance as to what was discussed" in the *Marsden* hearing, Baltodano said Judge Austin had reviewed the transcript earlier that day, found defendant had waived time, and said there was no basis for the *Marsden* motion.  The clerk's docket and minutes for that day indicates that the *Marsden* motion was denied.

The court indicated to defendant that it would allow him to represent himself.  In the course of the May 12 hearing, defendant submitted the necessary paperwork, and the court conducted a hearing and granted his *Faretta* motion.  The preliminary hearing was continued so that defendant would be able to prepare for it, and the parties ordered to return the following week to set a date for the hearing.

### Defendant Retains Other Counsel, Then Represents Himself

Also in May 2010, before the parties proceeded to a preliminary hearing, the district attorney added by amended complaint one count for inflicting corporal injury

3

upon a spouse, cohabitant or child's parent (§ 273.5, subd. (a)) and another for making criminal threats (§ 422). Defendant, who had retained private counsel, personally waived his right to a speedy preliminary hearing. In June 2010, the court granted the prosecutor's request to increase bail to $171,000, and defendant was remanded into custody.

In July 2010, defendant's preliminary hearing was held. The court ordered defendant held to answer the charges asserted and the People then filed an information charging defendant with resisting an executive officer, inflicting corporal injury on a spouse, cohabitant, or child's parent, and four counts of misdemeanor battery, to which defendant pled not guilty.[2] Despite his counsel's request that defendant be released on his own recognizance, he remained in custody.

In August 2010, at the beginning of a hearing on defendant's bail motion, his privately retained counsel asked permission to withdraw, to which defendant agreed. Counsel asserted that defendant had an "attitude and ideas about the case" that made "it difficult for any attorney to work with him." The court granted counsel's motion, as well as defendant's second *Faretta* motion to represent himself. It also reduced bail to $57,000, which defendant subsequently posted, obtaining his release from custody.

Defendant sought to have a blood sample that police had obtained from him shortly after his arrest tested for drugs. The court granted him multiple trial continuances so he could do so. When defendant informed the court that the lab would only deal with counsel, the court appointed as a liaison advisory counsel from the conflicts panel after the public defender's office declined to accept this limited appointment.

### Defendant's Second Marsden Motion

Near trial, defendant sought appointment of counsel from the conflicts panel, once again expressing his dissatisfaction with Baltodano. The court said it must appoint the public defender's office, unless that office had a conflict. Defendant said he would continue to represent himself. He then made a second *Marsden* motion, which the court

---

[2] The court subsequently dismissed one count of misdemeanor battery upon motion by defendant.

4

would not consider because there was no lawyer to replace.  Defendant, although still opposed to representation by Baltodano, accepted referral to the public defender's office in order to bring a third *Marsden* motion.

### Defendant's Third Marsden Motion

Upon Baltodano's reappointment, defendant filed a third *Marsden* motion.  He told the court Baltodano had not timely conferred with him before the August 2009 hearing, he had not intended to waive time for a preliminary hearing and had asked for other counsel, and Baltodano had repeatedly requested continuances because of her own work conflicts.  He said she had ignored his emails instructing her not to waive time again, and should have attempted to withdraw any time waiver he had made.  He also said he and Baltodano had exchanged "very hostile words" towards the end of her prior representation, the delay of the preliminary hearing had cost him additional money to renew bail, and Baltodano had not investigated his case in a timely manner.  He sought appointment of anyone but Baltodano because their relationship was not going to work.

Baltodano said she had explained to defendant his rights to a speedy preliminary hearing and why he should waive time before the August 2009 hearing, and defendant had agreed to do so.  She also had explained to defendant that she had sought some continuances because she was in trial on "serious cases."  She contended that defendant was raising issues that had already been rejected by the court in denying his first *Marsden* motion, including regarding his time waiver.  She further stated that she was prepared to represent defendant, did not take his complaints personally, and understood his frustration.

The court denied defendant's third *Marsden* motion and told defendant, "[y]ou two are going to have to just get along."  Defendant said he would not talk to Baltodano.

### Defendant's Fourth Marsden Motion

In May 2011, defendant filed a fourth *Marsden* motion.  He repeated many of his complaints about Baltodano's prior representation of him, argued that she should have withdrawn any waiver of time he had made, did not sufficiently challenge the People's March 2010 request for a continuance, and added that he had filed a complaint against

5

her with the Bar Association. Baltodano said she had never acted disrespectfully towards defendant, had diligently tried to contact and meet with him, and detailed to the court her contacts with him prior to the August 2009 hearing. She thought the court should allow her to continue to represent defendant because she was willing to work with him and knew his version of events.

The court denied defendant's fourth *Marsden* motion. Among other things, it found Baltodano to be credible and, on the other hand, did not find defendant "credible at all." It found defendant was "very clever" and "extremely manipulative," had filed his motion "once again for the purposes of delay," and was "purposefully failing to communicate with Baltodano due to issues of manipulation, anger and purposes of delay." The court advised defendant, apart from its ruling, that he should work with Baltodano because she was "one of the best attorneys in the Bay Area in felony criminal defense matters."

### *Defendant's Fifth Marsden Motion*

A jury trial began in June 2011. Before opening statements, defendant brought his fifth *Marsden* motion based on Baltodano's unwillingness to present an involuntary intoxication defense. He wanted an expert to testify that a drug, such as GHB, did not necessarily remain in a person's system for longer than three or four hours to explain why his blood had tested negative for drugs. He also said he was missing money and that a witness interviewed by Baltodano said he "looked out of it" that day, supporting his theory that someone drugged him, and that his theory was a plausible explanation for what happened, particularly given that the prosecution's theory lacked a motive.

Baltodano said the evidence did not support an involuntary intoxication defense. She intended to present evidence of his drinking instead.

The court denied defendant's fifth *Marsden* motion. It concluded, "counsel is making her best efforts to provide a constitutionally adequate defense. I don't see there's been a breakdown of communication, and trial tactics are based on a rational basis."

6

### *The Prosecution's Case*

The prosecution presented evidence that on the day of the incident, defendant attended a fish fry with Tamara Threadgill, with whom he had once had a relationship, and their teenage son, Kenneth Johnson, Jr. (Kenneth, Jr.), both of whom testified at trial. The gathering was at the apartment of Threadgill's daughter, Sarrita Harrison, in Pittsburg, California.

Threadgill's and Kenneth, Jr.'s testimony indicated that defendant drank throughout the gathering. He began to make vulgar sexual remarks to Threadgill, and continued to do so despite being told to stop. According to Kenneth, Jr., about a couple of hours after they had arrived, he and his father started arguing about weightlifting, and defendant, who was "kind of drunk," made another sexual remark about Threadgill. Kenneth, Jr. told him not to talk that way about his mother. Defendant became upset, starting yelling threats at Kenneth, Jr., and hit him in the chest. Threadgill jumped on defendant's back to get him off Kenneth, Jr. and defendant elbowed Threadgill in the stomach.

Kenneth, Jr. fled from the apartment. Defendant ran after him, saying, " 'Where's he at? Where's that little nigger? I'm going to kill him.' " Threadgill chased after defendant and told him to leave, and he elbowed her again. She saw defendant walk into a gazebo where a party was taking place and scream at a pregnant woman. Threadgill called the police, telling them defendant had "gone crazy."

Maria Garcia testified that she and some people were gathered in a social center for a baby shower in her honor when she heard shouting outside and saw a man enter the room who looked somewhat like defendant. The man grabbed Ronnie Oduca by the neck and pushed him against a window, then shouted a lot. Garcia, who did not speak much English, heard him say the word "nigger" repeatedly. When Garcia approached the man, he turned and pushed her shoulder forcefully. He moved towards other people at the party, pointing at them; after a few minutes, he left. Pittsburg Police Officer Sankara Dumpa testified that Garcia gave her a statement about this disturbance at the scene of the incident where defendant was arrested.

Pittsburg Police Officers Nicholas Boccio and Jessica Bledsoe testified that on the day of the incident, they responded to a dispatch call concerning a domestic disturbance at a Pittsburg apartment complex involving "an ex-Marine and boxer" who was "extremely intoxicated." Defendant came out of a community center of the apartment complex walking fast, and appeared to be extremely agitated, breathing heavily, perspiring profusely, and clenching his fists. He was extremely angry, not listening, and "fighting and yelling" at people. He squared off and faced Boccio in a combative, boxing-style stance with his fists clenched and advanced towards Boccio from about 20 feet away.

The officers, although their efforts were resisted and impeded by defendant, were able to handcuff him and take him to their patrol car. They smelled a strong odor of alcohol coming from him, and observed his eyes were bloodshot, red, and watery and his speech was slurred. Defendant, although he did not physically resist the officers as they took him to the patrol car, told them that they were "a bunch of pussies," he was a Marine, and he would get someone to "take care" of Boccio. He refused to put his legs into the car and yelled, "I'm a Marine, you can't do anything to me. You can't stop me. You're all a bunch of pussies." As Boccio tried to put his feet into the car, defendant kicked him in the chest, then kicked in his direction approximately two more times. The officers eventually pulled defendant into the car.

### The Defense Case

Paul Cahill testified that he was defendant's roommate for a decade, until shortly before trial. Defendant drank, not necessarily every night, but "more often than not," and became "drunk" about two-thirds of the time. Alcohol magnified his tendencies for anger. He became "verbally aggressive and sometimes irritating" to Cahill, and they had had some shoving and finger pointing incidents, but Cahill never saw him become physically aggressive with anyone. Defendant argued "a lot" with other people when he drank. Sober, defendant had a tendency to mumble, which became more pronounced when he drank. Defendant almost always kept his money in one or another of his socks

8

because he had lost wallets in the past. On cross-examination, Cahill acknowledged defendant had lost other items and was "careless."

Defense counsel solicited testimony from Officer Bledsoe that on the day of the incident, Threadgill told Bledsoe they went to the social gathering about 4:00 p.m, defendant drank most of three bottles of Hennessy, and the incident started when defendant was play fighting with Kenneth, Jr. Threadgill did not say defendant made sexual comments. Kenneth, Jr. gave a similar statement to Bledsoe and did not say anything about sexual comments, bench pressing, or weightlifting; his body was examined and no bruising was found.

Contra Costa County Criminalist Daryl Chan testified that a sample of defendant's blood taken approximately 7:45 p.m. on the day of the incident was found to have a 0.15 blood alcohol level, almost twice the legal limit. Given defendant's height and weight, and assuming he was contacted by police at 6:05 p.m. and burned off some alcohol thereafter, his blood alcohol level would have been 0.17 at the time of the contact. At these levels, a person would be delayed in understanding and responding to instructions, and possibly would not be able to comprehend them. On cross-examination, Chan acknowledged that defendant could have still been absorbing alcohol at the time of his arrest and heavy drinkers can have a higher tolerance for alcohol.

Defendant also testified. He said he remembered the day's events "for the most part." He did not engage in aggressive actions or inappropriate behavior. He was almost 50 years old, a former Marine, a one-time amateur boxer, had two children with Threadgill from their previous relationship, had contacted her that day to arrange a time to see Kenneth, Jr., and had agreed to Threadgill's idea that they go to Sarrita's apartment for a cookout. He had $2,500 in $100 bills in his left sock, where he typically kept his money. At Sarrita's apartment, he pulled out the money in front of people to give Sarrita $100 to shop for food.

Defendant testified that he and Sarrita later went to a liquor store, where he bought a pint of Hennessey. When they returned, he poured some into a shallow champagne glass and sat on the living room couch drinking, leaving the bottle on the kitchen counter,

9

where he could not see it. He denied drinking magnified his tendency towards anger or that he had "anger issues."

Over the next couple of hours, defendant said, he refilled his glass two or three times. He began to feel "really weird," "almost like an out of body experience," which had not happened to him before. He could hardly stand and could not speak his thoughts. Defendant felt someone whom he could not identify because of his altered state reach into the sock where he kept his money. He tried to pull the hand away and leave the apartment. Threadgill grabbed him; he pulled away from her and went outside. He did not remember play fighting, arguing with, or hitting Kenneth, Jr., or making sexual comments to Threadgill.

Defendant said that, once outside, he did not want to drive in his altered state. He went to a community center and grabbed Ronnie Oduca, trying to say that he needed help, but he could not say the right words. Garcia attacked him and he put out his hand trying to keep her from hitting him.

Two uniformed police officers arrived, who defendant thought were there to help him. He walked up to them peaceably without any intent to attack them, and got down on the ground immediately when told to do so. The officers did not allow him to explain what he was experiencing, very aggressively handcuffed him, causing him a lot of pain, and took him to a patrol car. Although he was "pretty pissed off" at the police, expressed his disappointment to them, and may have said some profanities, he did not say what the officers claimed he said.

Defendant further testified that Boccio threw him into the car, causing him to hit his head on the car door. He struggled to sit up on the slippery car seat and Bledsoe yanked him across the seat. Money fell out of his sock. He continued to express his dissatisfaction, but the officers' testimony exaggerated "a little bit" what he said. Asked if he kicked Boccio in the chest, defendant answered, "Not with ever any intent to kick him at all."

10

### *Verdict, Sentencing, and Appeal*

The jury found defendant guilty of resisting an executive officer, Boccio, and misdemeanor batteries against Kenneth, Jr., Ronnie Oduca, and Martha Garcia, found him not guilty of inflicting corporal injury on a spouse, cohabitant, or child's parent, and of the lesser included offenses. The court suspended imposition of sentence and placed defendant on probation with certain conditions, including that he serve seven months in county jail. Defendant filed a timely notice of appeal.

## DISCUSSION

### I. *Defendant's Ineffective Assistance of Counsel Claim*

Defendant first argues that he received ineffective assistance of counsel from Baltodano because she refused to investigate and argue the defense of involuntary intoxication on his behalf. We disagree.

In order to establish a claim of ineffective assistance of counsel in a direct appeal, a "defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)

Defendant argues he does not need to show he was prejudiced by Baltodano's failure to present an involuntary intoxication defense because this in effect denied him

11

counsel entirely, making such a showing unnecessary pursuant to *United States v. Cronic* (1984) 466 U.S. 648, 658-659.

As we have discussed, defendant testified that he felt weird and had an out-of-body experience that made it difficult for him to communicate his thoughts and put him in an altered state after he drank a pint of Hennessey at the social gathering. The trial court instructed the jury sua sponte regarding involuntary intoxication. Defense counsel did not present evidence on the issue and did not refer to involuntary intoxication in her closing argument. Instead, she argued that voluntary intoxication negated the specific intent required to establish defendant resisted an executive officer.

Defendant contends his purported involuntary intoxication would have been a complete defense under the circumstances. (See, e.g., *People v. Scott* (1983) 146 Cal.App.3d 823, 831-833 [involuntary intoxication resulting from unknowingly drinking hallucinogen-containing punch negated criminal intent to unlawfully take another's vehicle under mistake of fact theory].) Defendant, quoting from *People v. Easley* (1988) 46 Cal.3d 712—an inapposite case involving an attorney found to have a conflict of interest based on multiple representations—argues Baltodano did worse than " 'pull[] [her] punches' " (*id*. at p. 725) by failing to present an involuntary intoxication defense.

Defendant's argument is unpersuasive because the record supports Baltodano's conclusion that there was insufficient evidence to support an involuntary intoxication defense. A blood sample taken from defendant upon his arrest tested negatively for drugs, such as GHB. Defendant told the court he understood from unidentified "experts" and from reading "date rape type cases and Mickey Finn type cases" that these types of drugs remained in a person's system for a short duration, perhaps three or four hours. Defendant does not identify anywhere in the record where he established this is in fact the case. Even assuming for the sake of argument that it is correct, he does not establish that the blood sample obtained by police was taken beyond the time for such a drug to dissipate in his system. Evidence introduced at trial suggests the contrary. Chan testified that the blood sample was drawn at 7:45 p.m. on the day of the incident, and Bledsoe said Threadgill reported that she, defendant and Kenneth, Jr., went to Sarrita's apartment

12

about 4:00 p.m. that day. This testimony indicates the blood was drawn within a couple of hours of defendant's arrest. There was no evidence to support his involuntary intoxication theory other than his own insubstantial, self-serving testimony, which was also seriously compromised by the contradictory testimony of multiple witnesses and the high blood alcohol level found in his blood sample.

On the other hand, the record indicates there was strong evidence of defendant's voluntary intoxication, which Baltodano relied on in her defense. That included Threadgill and Kenneth, Jr.'s testimony about defendant's drinking and drunken condition at the social gathering, the officers' testimony that defendant smelled of liquor, and Chan's testimony that defendant's high blood alcohol level soon after his arrest was close to twice the legal limit.

We conclude that Baltodano provided a professionally competent representation based on the available evidence. As the People note, "[t]here is no constitutional right to an attorney who would conduct the defense of the case in accord with the whims of an indigent defendant." (*People v. Lucky* (1988) 45 Cal.3d 259, 281.) "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] . . . 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' " (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.) Defendant's ineffective assistance of counsel claim is without merit.

## II. *Defendant's Marsden Motions*

Defendant argues that the trial court abused its discretion in failing to grant any of his five *Marsden* motions to relieve Baltodano and appoint new counsel for him. Defendant's arguments are unpersuasive.

"[S]ubstitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly

13

differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Smith* (1993) 6 Cal.4th 684, 696 (*Smith*).)

"[N]ew counsel should not be appointed without a proper showing. . . . The court should deny a request for new counsel at any stage unless it is satisfied that the defendant has made the required showing. This lies within the exercise of the trial court's discretion, which will not be overturned on appeal absent a clear abuse of that discretion." (*Smith*, *supra*, 6 Cal.4th at p. 696.)

In his opening brief, defendant presents general arguments, with little supporting law, why the trial court should have granted his *Marsden* motions. He discusses the factual background regarding his five motions, but does not identify any particular abuse of discretion by the court in denying any of them. Instead, he complains that, assuming he made a knowing and intelligent waiver of his right to a speedy preliminary hearing, "[t]ime again, [defendant] showed unmistakable evidence that his counsel was ignoring his pre-trial confinement status, and not investigating his sole defense." He further complains that his counsel did nothing when he insisted on no further delay of his preliminary hearing, continued the hearing because of her own unavailability, made only half-hearted objections to the prosecutor's requests for continuances and failed to insist that the prosecution make the requisite showings for such continuances, and did not make a bail reduction motion on his behalf.

After a year of this "nonsense," defendant contends, he "gave up" and elected to represent himself without the court ruling on his first *Marsden* motion. He was ignored by the court when he sought conflict-free counsel, and by Baltodano when he sought to present evidence at trial that supported his involuntary intoxication theory.

Defendant concludes, "[t]here can be no clearer evidence of a total breakdown in communications. Every judge before whom [defendant] appeared during the course of

14

his two-year ordeal should have recognized this breakdown. The lack of trust and communication between [defendant] and Baltodano is stark and unmistakable."

Defendant's general arguments are unpersuasive. To the extent he argues the trial court abused its discretion by failing to grant his *Marsden* motions because of his disagreement with Baltodano about investigating and presenting an involuntary intoxication defense, this lacks merit. "Tactical disagreements between defendant and his attorney do not themselves constitute an 'irreconcilable conflict.' " (*People v. Welch*, *supra*, 20 Cal.4th at pp. 728-729.) Nor does a disagreement between defendant and appointed counsel concerning trial tactics necessarily compel the appointment of another attorney." (*People v. Lucky*, *supra*, 45 Cal.3d at p. 282.) As we have discussed, defendant does not show that his involuntary intoxication defense theory had any merit, nor does he show that Baltodano did not provide him with professionally competent representation based on the available evidence.

As for Baltodano's role in the delay of defendant's preliminary hearing from July 2009 to May 2010, when he assumed his own representation, defendant does not establish that the court abused its discretion in determining her actions were not bases for granting any of defendant's *Marsden* motions. He does not challenge that in 2009 and 2010, Baltodano, as she asserted below, needed more time to investigate his case or was not available because of work conflicts, nor that the public defender's office could not accommodate his request that another attorney be assigned to his case, nor does he establish that these matters rendered Baltodano's representation of him ineffective or improper grounds for seeking further continuances (see, e.g, *People v. Superior Court* (*Lerma*) 48 Cal.App.3d 1003, 1009 [good cause to continue trial exists "when defense counsel has been engaged in another trial or has requested additional time in which to prepare for trial"]); he only establishes that he was against further delays and dissatisfied with Baltodano's performance, and contends that this led to an irreconcilable conflict between them.

Defendant also argues Baltodano should have done more to oppose the prosecutor's two requests for continuances in March and April of 2010. Whether or not

15

that is the case, the resulting delays were minimal and occurred when defendant was not in custody, having posted bail.[3] Also, Baltodano timely opposed these requests on certain grounds, and also planned, consistent with her opposition, to bring a bail reduction motion when defendant brought his first *Marsden* motion consistent with the grounds for her opposition.[4]

Defendant's frustration with the months of delay of his preliminary hearing is understandable. However, the record is clear that he waived time for a speedy preliminary hearing. As the People point out, this waiver, once given, could not be withdrawn. (*People v. Love* (2005) 132 Cal.App.4th 276, 285 [the Legislature has not "created a provision for the withdrawal of properly entered waivers" to a speeding preliminary hearing] in the relevant statute, section 859b].) In his reply brief, defendant attempts to distinguish his circumstances from *Love*, but regardless, *Love* holds that a waiver of a speedy preliminary hearing, once given, cannot be withdrawn. In light of his waiver, defendant does not establish how the delay of his preliminary hearing during Baltodano's first appointment substantially impaired his right to assistance of counsel or a speedy trial.

Furthermore, contrary to his contention that Baltodano's representation caused significant delay in his trial, the record indicates defendant was responsible for substantial delay. His own unreasonableness caused his private counsel to withdraw from representing him, and he insisted on pursuing a meritless voluntary intoxication

---

[3] The parties also debate the propriety of the court's grants of these continuances based on the prosecution's assertion that material witnesses were temporarily unavailable to testify and whether or not defendant waived certain issues regarding them. However, defendant's appeal is not from the court's continuance rulings. Therefore, we do not address these issues further, other than to note that, as the People point out, "[t]he decision whether to grant a continuance of a hearing to permit counsel to secure the presence of a witness rests in the sound discretion of the trial court." (*People v. Roybal* (1998) 19 Cal.4th 481, 504.)

[4] We disagree with defendant's contention that the court did not rule on his first *Marsden* motion. As we have indicated, the clerk's docket and minutes for May 12, 2010, states that the motion was denied.

16

defense theory.  Therefore, we conclude defendant's claim that the trial court abused its discretion in denying his *Marsden* motions because of Baltodano's role in the delay in his preliminary hearing and, by extension, in his trial, lacks merit.

Finally, defendant's contention that the court abused its discretion in not granting his *Marsden* motions because of the purported total breakdown in his communications with Baltodano is also unpersuasive.  As the People point out, a conflict between a defendant and counsel will not be considered irreconcilable " 'if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1086.)  As quoted by the trial court in denying defendant's fourth *Marsden* motion, " ' "[i]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." ' " (*People v. Memro* (1995) 11 Cal.4th 786, 857.)

None of the state or federal case law cited by defendant in his reply brief contradict these holdings or address circumstances like those before us.  (See, e.g., *People v. Eastman* (2007) 146 Cal.App.4th 688, 695-698 [trial court should have held a *Marsden* hearing to make a record sufficient to show defendant's grievances and the trial court's responses]; *People v. Munoz* (1974) 41 Cal.App.3d 62, 66 [trial court should have made inquiries when defendant claimed his attorney did not want to defend him, and his attorney remained silent]; *United States v. Nguyen* (9th Cir. 2001) 262 F.3d 998, 1003-105 [defendant's Sixth Amendment right to counsel was violated by denial of his motion to substitute counsel in the face of the complete lack of communication between counsel and defendant, which was acknowledged by counsel].)  The record indicates that, other than the defendant's defective second *Marsden* motion, which he made while representing himself, the court held hearings, made inquiries, and gave defendant the opportunity to discuss his concerns.  The record also indicates that defendant was a very difficult client who fixated on the delay of his preliminary hearing long after it occurred

17

without establishing that it significantly impaired his defense, right to a preliminary hearing, or right to a speedy trial, persisted in criticizing Baltodano for not pursuing a meritless defense theory, and did not make a sustained good faith effort to work out his disagreements with her, particularly after her reappointment. Baltodano, on the other hand, continually indicated her willingness and ability to represent and work with defendant, which representations the court was entitled to believe in its discretion.

Indeed, unlike any of the cases cited by defendant, when the court denied defendant's fourth *Marsden* motion after hearing, it specifically found he was not credible, and had brought the motion in order to further delay the proceedings, and that Baltodano was credible. Defendant does not explain why we should disregard these factual findings, and we have no reason to disagree with them. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245 [in ruling on a *Marsden* motion, a court is entitled to accept counsel's explanation " '[t]o the extent there was a credibility question between defendant and counsel at the hearing' "].)

In short, the trial court did not abuse its discretion in denying defendant's *Marsden* motions.

**DISPOSITION**

The judgment is affirmed.

_____
Lambden, J.


We concur:


_____
Haerle, Acting P.J.


_____
Richman, J.

18